**Erin HANEY, Appellant,**

v.

**Biljana MONSKY (as Next Friend of Max Zager, a Minor Child), Appellee.**

No. 2008–SC–000337–DG.

Supreme Court of Kentucky.

April 22, 2010.

As Corrected May 7, 2010.

Stephen Perry Durham, Assistant Jefferson County Attorney, Louisville, KY, for Appellant.

Robert L. Heleringer, Louisville, KY, for Appellee.

Opinion of the Court by Justice SCOTT.

This is an appeal from an opinion of the Court of Appeals affirming the decision of the Jefferson Circuit Court that denied Appellant, Erin Haney, summary judgment on the grounds that she is not entitled to qualified official immunity from the negligence claims that Appellee, Biljana Monsky, as next friend of Max Zager, asserts against her. For reasons that Haney's duties were discretionary in nature so as to entitle her to the defense of qualified official immunity as a matter of law, we hold that the trial court improperly denied her motion for summary judgment. We, therefore, reverse the decisions of the Court of Appeals and the Jefferson Circuit Court and remand this matter to the trial court for further proceedings consistent with this opinion.

## I. Background

In early 2005, Erin Haney was twenty-one years old and completing her junior

year at Centre College when she learned of a summer job opportunity serving as a full-time children's camp counselor at the Louisville Zoo. The zoo's summer camp was a popular annual program and was designed to be an enriching and educational experience for children, teaching them the diversity of plants and animals and also engaging them in a variety of complementary learning activities.[1] Haney applied for a position and, once accepted, was to work with small groups of six to eight year old children.

Just prior to the camp's opening in May of that year, Haney and the summer camp counselors received on-site training in assorted topics. As a group, the counselors learned, among other things, about the zoo, its animals, and environments; zoo safety, rules and regulations; CPR and first aid measures; behavioral problems and developmental needs of children; and, several games, crafts, and activities. The training involved lectures, hands-on activities, animal handling, and behind-the-scenes tours.

One of the activities the counselors learned to conduct with the children was commonly called "Night Hike." The Night Hike activity was intended to teach the children that vision is a sense that is taken for granted and that other animals heavily rely upon non-visual senses in navigating their environments. In Night Hike, the children form a single file line upon a short, clear, and level trail path. From there, all children but the line leader wear a blindfold and place one or both hands upon the shoulders of the child directly in front of them—so as to link the line together. The line leader then slowly proceeds along the path as the camp counselor walks behind and observes. As they walk, the counselor reminds the children to feel the ground beneath them and to listen to the sounds around them so they can better anticipate and navigate the path. When the children reach the end of the path, they may exchange turns being line leader and walk the path again.

The activity was a popular one. The counselors received 10 to 15 minutes of training on how to conduct Night Hike, should they later choose to do so, including instructions to select a path free from debris and one away from noise and distraction.[2] The counselors participated in a demonstration of the activity themselves to better understand it.

In late June of 2005, seven-year-old Max Zager attended the Louisville Zoo summer camp and was assigned to Haney's group, comprised of ten (10) seven and eight year olds.[3] On Wednesday, Haney decided to conduct the Night Hike activity with the children, including Max. Prior to doing so, she took the children aside and explained to them the purpose of activity and the importance of remaining quiet and attentive while they were walking along the path. Haney then selected an appropriate path and led the group along it four times without blindfolds so that they would be familiar with its direction.

---

1. Upon payment, children were enrolled in a week-long program, lasting from 9:00am to 4:00pm daily. The campers returned home in the evenings.

2. The zoo taught the counselors several activities, though the counselors were free to design their own activities in forming their own weekly schedules. Every week, the counselors completed a program outline of what activities they intended to do with the children and a zoo educator reviewed the outline to ensure that the selected activities were age appropriate.

3. Max is a Florida resident and was visiting Appellee, his grandmother, that summer when she enrolled him in one of the zoo's week-long camps. Appellee is a resident of Louisville, Kentucky.

The activity then began and the children shared leader responsibilities approximately six times successfully negotiating the trail. On the seventh or eighth trip, however, when the line leader began to veer in a direction that would have led off of the path, Haney, watching from behind, cautioned the group that they were getting too close to the path's edge.[4] At that point, some of the children began to suddenly trip on one another and Max and two others fell down upon the path. When Max got back to his feet, he was holding his arm in pain. As it turned out, he had suffered a fractured shoulder.

Appellee, as next friend of Max, subsequently filed suit against Haney and alleged that she was negligent in her supervision. At the conclusion of discovery, Haney moved the trial court for summary judgment and argued that, as a public employee, the complained of actions or inactions were discretionary in nature which rendered her immune from suit. The trial court, however, found the conduct at issue to be ministerial in nature and overruled Haney's motion. Haney then filed an interlocutory appeal, and the Court of Appeals affirmed the decision of the trial court. This Court granted Haney's motion for discretionary review.[5]

## II. Standard of Review

"Summary judgment procedure authorized by CR 56.01 et seq. is intended to expedite the disposition of cases and if the grounds provided by the rule are established, it is the responsibility of the trial judge to render an appropriate decision." *Pile v. City of Brandenburg,* 215 S.W.3d 36, 39 (Ky.2006). Summary judgment is generally appropriate where "the pleadings, depositions, answers to interrogatories, stipulations and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. This Court has also held that summary judgment is proper "where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991). In either case, "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial." *Hubble v. Johnson,* 841 S.W.2d 169, 171 (Ky. 1992). A "trial court must then view the record 'in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor.'" *Rowan County v. Sloas,* 201 S.W.3d 469, 474 (Ky.2006) (*quoting Steelvest,* 807 S.W.2d at 480).

---

**4.** Because it was slightly elevated, the trail path's edge dropped off about a foot to the ground below.

**5.** At the outset, we must emphasize that we have not re-addressed here the question of whether the Louisville City Zoo or its parent entity, the Louisville/Jefferson County Metro Government, were entitled to sovereign immunity—an analytical predicate to the foregoing discussion, *see Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.,* 295 S.W.3d 91, 99 (Ky.2009) ("[A]n entity's immunity status depends to some extent on the immunity status of the parent entity."), *Autry*

*v. Western Kentucky University,* 219 S.W.3d 713, 719 (Ky.2007) (An agent "derives its immunity status through" the principal.), *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky. 2001) ("[A]n officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled.")—as it was not before this Court for reasons that the trial court, on motion of the county attorney, dismissed Zager's suit against the Louisville/Jefferson County Metro Government on grounds of sovereign immunity. No party challenged that determination.

In the context of qualified official immunity, "[s]ummary judgments play an especially important role", as the defense renders one immune not just from liability, but also from suit itself. *Sloas,* 201 S.W.3d at 474 (*citing Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Here, the material facts have been resolved, and thus our review is one of law, focusing on whether the moving party, Haney, was entitled to the defense of qualified official immunity and, consequently, judgment as a matter of law. *See Pile,* 215 S.W.3d at 39–40; *Sloas,* 201 S.W.3d at 475.

### III. Qualified Official Immunity

As this Court thoroughly explained in *Yanero v. Davis,* when an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, "which affords protection from damages liability for good faith judgment calls *made in a legally uncertain environment.*" 65 S.W.3d 510, 522 (Ky.2001) (emphasis added) (*citing* 63C Am. Jur. 2d *Public Officers and Employees* § 309 (1997)). Application of the defense, therefore, "rests not on the status or title of the officer or employee, but on the [act or] function performed." *Id.* at 521 (*citing Salyer v. Patrick,* 874 F.2d 374 (6th Cir.1989)).

Indeed, the analysis depends upon classifying the particular acts or functions in question in one of two ways: discretionary or ministerial. Qualified official immunity applies only where the act performed by the official or employee is one that is discretionary in nature. *Id.* Discretionary acts are, generally speaking, "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* at 522 (*citing* 63C Am. Jur. 2d § 322). It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed. *Upchurch v. Clinton County,* 330 S.W.2d 428, 430 (Ky.1959). On the other hand, ministerial acts or functions—for which there are no immunity—are those that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero,* 65 S.W.3d at 522 (*citing Franklin County v. Malone,* 957 S.W.2d 195, 201 (Ky.1997)).

In spite of these often quoted guidelines, determining the nature of a particular act or function demands a more probing analysis than may be apparent at first glance. In reality, few acts are ever purely discretionary or purely ministerial. Realizing this, our analysis looks for the *dominant* nature of the act. For this reason, this Court has observed that "an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with *a discretion respecting the means or method to be employed.*" *Upchurch,* 330 S.W.2d at 430 (emphasis added).[6] Similarly, "that a necessity may exist for the ascertainment of those [fixed

---

6. We do note, however, that this maxim is too often divorced from its facts so as to raise more caution than is perhaps necessary. In *Upchurch,* a farm owner brought suit against Clinton County and its fiscal court members after losing several of his sheep to a number of dogs. 330 S.W.2d at 429. In his complaint, Upchurch asserted that, "pursuant to

and designated] facts does not operate to convert the [ministerial] act into one discretionary in its nature." *Id.* (emphasis added). Moreover, a proper analysis must always be carefully discerning, so as to not equate the act at issue with that of a closely related but differing act. *Cf. Sloas,* 201 S.W.3d at 478 ("[T]he the portions of the investigative responsibilities as set out in the regulations ... *were particular in their directive,* but we noted that others, which required the exercise of judgment, were not.... The first part was ministerial, but what followed was held to be discretionary.") (emphasis in original) (*citing Stratton v. Commonwealth,* 182 S.W.3d 516, 521 (Ky.2006)). With these considerations in mind, we turn to the issue before us.

## IV. Issue Presented

The issue that we confront on this appeal is a relatively narrow one: whether

> the terms of KRS 258.195(1), each county was mandatorily required to employ a dog warden ... and to establish a dog pound" and that the defendants had "wilfully failed and neglected, up to the present time, to consummate their official duties in this respect." *Id.* The trial court, however, found the duties to be discretionary in nature and dismissed the complaint for failure to state a claim on which relief could be granted. *Id.* at 430. On appeal, our predecessor Court disagreed and concluded that "[t]he duty required to be performed under [KRS 258.195] was not of a discretionary nature; it was ministerial in character. The law states that a dog warden *shall* be appointed and a dog pound *shall* be established and maintained." *Id.* Though the statute did not "set forth the qualifications, the salary, the duties and the term of office of the dog warden," the Court explained that
>
>> [t]hese features are mere details or side issues which do not change the ministerial aspect of such an appointment.... KRS 258.195(1) made the naming of a dog warden and the setting up of a dog pound ministerial when it placed upon the fiscal court members the imperative duty to ap-

Haney's supervision of the children in the Night Hike activity was a discretionary or ministerial function.[7] Appellee broadly argues that Haney negligently placed the children in a dangerous activity and that she conducted the activity in a negligent manner.[8] We review these allegations and focus on the nature of the acts or functions implicated.

## V. Analysis

 At the outset, we believe that there can be no viable contention that Haney's act *in choosing* to conduct the Night Hike activity was not a discretionary function. The affidavit of Marcelle Gianelloni, curator of the Louisville Zoo Education Department, establishes that Haney and other camp counselors were allowed to choose whether to use the Night Hike activity from a number of pre-approved activities. Gianelloni explained that

> point such an officer and provide for the care of impounded dogs. The necessity to do such acts is still imposed and must be carried out, *although some discretion must be resorted to as regards the means to be employed in the execution of the acts."*
> *Id.* (emphasis added).

7. While, to be sure, qualified official immunity applies only where there is *also* a showing that the act or function was performed in good faith and within the scope of the employee's authority, *Yanero,* 65 S.W.3d at 522, these elements of the defense have remained undisputed in Haney's favor. We thus devote our analysis to only one the defense's three requirements and the issue that the lower courts have primarily addressed here: that the act or function be discretionary in nature.

8. Though Appellee asserts in her complaint that Haney was negligent "by placing the children in a dangerous situation in which they were blindfolded as they traversed uneven, unfamiliar terrain" and by failing to warn the children of an "inherently dangerous" situation, both allegations sound in breach of her duty of supervision in the Night Hike activity.

[e]very week, the counselors fill out a program outline of what they are going to do. This is given to one of our counselors, who review the weeklong program to make sure everything is age appropriate. The counselors were allowed to choose whether to use the 'Night Hike/Practice Makes Perfect' activity, where to conduct the activity . . . and how often the activity could be used. In Haney's affidavit, she, too, stated that she was "free to select the daily activities", and (in her deposition), added that, "[w]e did not have to do these activities. These were just activities that they were gonna help us to make our schedules[.]" That Haney was "encouraged" to use the popular Night Hike activity and, in fact, never conducted an activity that was not designed by the camp does not alter our conclusion that she ultimately retained complete discretion as to whether to conduct the activity at all.

Moving on, we address Appellee's primary argument. In asserting that her suit implicates Haney's ministerial acts or functions as camp counselor, Appellee contends that Haney's training was such that her supervision over the children in conducting the Night Hike activity could not be a discretionary function. In other words, Appellee argues that the training Haney received from the camp in how to conduct the Night Hike activity was sufficiently comprehensive, detailed, and definite so as to constrain her "exercise of discretion and judgment" and thus transform her act of supervising the activity into a ministerial duty that was "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero,* 65 S.W.3d at 522. Yet, in holding up Appellee's specific allegations of negligent supervision against the training Haney actually received, this Court cannot agree.

Appellee first argues that Haney failed to "keep the children in the middle of the path" on which the Night Hike activity was conducted and that her failure to do so constituted a violation of a known rule or order. Thus, similar to the baseball coach in *Yanero,*[9] Appellee believes that Haney's failure to enforce a known rule indicates that her duty was inherently ministerial for which she has no immunity.

However, because the counselors necessarily retained significant discretion in its enforcement, we believe that the instruction at issue here is fundamentally different from that considered in *Yanero.* In *Yanero,* the rule requiring that student athletes wear helmets during batting practice represented an essentially objective and binary directive. That is to say, the children were plainly wearing their helmets during batting practice or they were not. There is no substantial compliance with such an order and it cannot be a matter of degree: its enforcement was "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* at 522.

Here, on the other hand, we are confronted with a single oral instruction to "keep the children in the middle of the path" given during a 10 to 15 minute training session on how to conduct the Night

9. In *Yanero,* a minor engaged in batting practice without a helmet and was later injured when struck in the head with an errant pitch. 65 S.W.3d at 517. The child asserted a claim of negligent supervision against the assistant junior varsity baseball coach and this Court held that the coach was not entitled to the defense of qualified official immunity because the performance of his supervisory duties "in this instance" were ministerial in nature "in that it involved only the enforcement of a known rule requiring that student athletes wear batting helmets during baseball batting practice." *Id.* at 529.

Hike activity.[10] Though the aim of the instruction was, like *Yanero,* to ensure the safety of the activity, we cannot say that its enforcement was similarly ministerial because, here, it was a general and continuing supervisory duty to keep the children on the middle of the path which depended upon constantly changing circumstances—indeed, the continuing moment-by-moment, worm-like movement of all the children upon the path. Moreover, its enforcement was largely subjective and "left to the will or judgment of the performer", as keeping the children in the middle of the path could certainly "be performed in one of two or more ways, either of which would be lawful[.]" *Upchurch,* 330 S.W.2d at 430. The instruction did not in any way specify how to "keep" the children in the middle of the path should they suddenly stray from it. This is not to say that every rule or order must be exhaustively specific to make a general supervisory duty a ministerial function, but it must, at least, be sufficiently specific to restrict significant discretion in its enforcement. That cannot be said here.

For similar reasons, we cannot agree that the ministerial nature of Haney's duties was evidenced by her failure to place the children into smaller groups before conducting the Night Hike activity. Appellee places great weight on a particular handout the counselors were given during their training and argues that it creat-ed a defined rule which Haney had no choice but to enforce. However, an examination of the one page handout shows that its intended audience was children who desired to conduct the Night Hike activity themselves.[11] As such, its instructions do not impose absolute duties upon the counselors.[12] Gianelloni's affidavit confirms this, as she clearly stated that the counselors "were allowed to choose ... how many people to include in a single line." Because there is no evidence showing that the terms of the handout were intended to be any more than suggestions and were simply distributed in conjunction with the brief training on the activity, we do not believe that the handout required Haney to break the children into smaller groups.

We also find unpersuasive Appellee's arguments that Haney was required to stop the children in the event that they strayed from the middle of the path while conducting the Night Hike activity. Similar to contentions we have already addressed, Appellee claims that Haney's failure to comply with such a requirement indicates the ministerial nature of her role in supervising the activity. Again, if the requirement actually existed, we could perhaps agree. In her deposition, Haney specifically negated Appellee's assertion:

Q. Had you been taught by the—during the training that one of the safety measures that you might consid-

---

10. The *only* evidence that Appellee points to in claiming the existence of the instruction is Haney's admission that an oral instruction to that effect was given during her training in the activity.

11. The handout was simply a copied page from a children's activity book, *Night Science for Kids* by Terry Krautwurst, titled "Practice Makes Perfect/Night Hike." Haney was not provided a copy of the book.

12. The language that Appellee relies upon here, in relevant part, reads: "When you get back, choose a leader. Everyone else gets a blindfold. No fair peeking under or over the bandana! (If there are lots of kids, separate into groups of no more than four, a leader and three hikers each)." Haney rightly counters that "lots" was not a defined term, either in the handout or during her training, and that a lack of instruction on that point indicates that it was a determination left to the discretion of the counselors, based upon the particular facts before them such as the age and ability of the participants.

er taking if they [the children] got too close to one edge or the other was to have them stop what they were doing?

A. It never—Yes, I mean, it never came across that way. It never—I mean, we never went through that point.

Q. During the training?

A. No.

Though Appellee claims that Haney had an affirmative duty to immediately stop the children in that scenario, Appellee identifies no instruction on the issue in any form from Haney's training or otherwise. In the absence of any instruction on the matter, we believe Haney's response was one left to her discretion. Here, she chose to caution the children that they were getting too close to the path's edge. Unexpectedly, this apparently created a chain reaction of tripping behind the leader.

In reviewing Appellee's specific allegations, we think it evident that Haney's duties in supervising the Night Hike activity were discretionary in nature. In general, supervising the physical activity of others is often a passive function in that an individual is broadly charged with ensuring the safety of the participants. Though Haney did receive some training so that she might know how to conduct the Night Hike activity should she later choose to do so, many of the activity's finer points were only briefly addressed and some not at all. It would have, indeed, been difficult for the training program here to foresee the many concerns and potential dangers that could arise during the counselors' supervision of the children in the numerous activities they could conduct. For that matter, it seems that few systems are capable of comprehensively training employees and officers and promulgating rules and regulations so as to anticipate supervisory uncertainties and thereby require certain actions in certain situations.

By way of contrast, we have held that a claim of negligent supervision may go to a ministerial act or function in the public school setting. In *Yanero*, batting practice was a specific and recurring activity where helmets were provided for their required use in maintaining the student athletes' safe participation. The coaches appeared widely aware of that rule and, in fact, informed Yanero of its requirement. 65 S.W.3d at 528 ("Yanero had been playing organized baseball for eleven years prior to his injury. He admits that every coach along the way, including Davis and Becker, had told him that he was required to wear a batting helmet during batting practice."). Also, in *Williams*, this Court rejected the notion that the failure of teachers and school administrators to supervise their students in the face of known and recognized misbehavior was a discretionary act. 113 S.W.3d at 150. There, we noted that KRS 161.180(1) required them to "hold pupils to strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities." *Id.* (*quoting* KRS 161.180(1)).[13]

But outside of that setting, we have found that supervising the conduct of others is a duty often left to a large degree—and necessarily so—to the independent discretion and judgment of the individual supervisor. In *Sloas*, we held that a deputy jailer's act of supervising inmates engaged in a voluntary work program was "as discretionary a task as one could envision", observing that

13. In addition, student misconduct was further defined through a Code of Conduct adopted by the local Board of Education (pursuant to KRS 160.290) and "charged the teachers with the responsibility to 'enforce rules and regulations of the Board of Education.'" *Williams*, 113 S.W.3d at 150–51.

[o]ne man, ... [was] in charge of this *crew*. He has to watch them, and try as best he can to anticipate what they might do, correct them as necessary, determine their capabilities, sometimes by asking them forthright whether they can or can't do the job, assign the duties and see that the work is performed.

201 S.W.3d at 480 (emphasis in original).[14] We view as similar Haney's role as camp counselor and her duty to supervise the safety of the children's physical activities. When it came to ensuring the safe participation of the children in the Night Hike activity, Haney's training was largely silent on the matter and, to the extent that she was offered relevant instruction, it was broadly defined and not mandatory. Where her training and instruction were silent, her duties, like the deputy jailer in *Sloas*, were those generally imposed to exercise reasonable care under the circumstances. Taken alone, we do not believe those duties to be ministerial in nature and, indeed, should not be, lest we transform all general duties into ministerial acts and functions, thus eviscerating the doctrine of qualified official immunity. In this respect, it is worth remembering that a motivating policy of qualified official immunity is that officials who happen to be charged with duties that call for the exercise of their judgment and discretion should not be held personally liable to an individual for damages because such a result would "deter independent action and impair the effective performance of their duties." 67 C.J.S. *Officers* § 255 (2009). Indeed, we do not think it appropriate for the threat of liability to be imposed upon Haney where, in many instances, she was essentially asked to supervise the safety of the children to the best of her ability in an event that occurred in an unpredictable manner.

▮ This is not to say, however, that an employee or official must necessarily contravene a particular statute or regulation for his or her act or function to be deemed ministerial. While, indeed, a statute or regulation may create or impose a duty upon an employee or official, the question ultimately depends upon the *nature of the duty*. Cf. *Upchurch*, 330 S.W.2d at 430 ("KRS 258.195(1) provides in part that the fiscal court of each county in this state *shall* on or before July 1, 1954, employ a dog warden, and *shall* on or before July 1, 1955, establish and conduct a dog pound.") (emphasis in original). Because it is the nature of the duty that controls the analysis, we have also recognized that a common law duty—if specific and affirmative in its command—could render an act or function essentially ministerial *in the absence of any statute or regulation on point. See Sexton*, 256 S.W.3d at 33 ("In some situations, an act may be ministerial even if that act is not specifically covered by applicable statutes, or administrative regulations. For example, ... if a state entity has actual notice of the existence of a dead or dangerous tree on property owned by that state entity, inspecting or removing the tree may be a ministerial act."). In either case, therefore, what tends to demonstrate the ministerial nature of an act or function is whether the alleged action or inaction is an identifiable deviation from an "absolute, certain, and imperative" obligation—whatever its source—such that it requires "only obedience" or "merely execution of a specific act from fixed and designated facts." *Yanero*, 65 S.W.3d at 522.

---

14. In *Sloas*, a Rowan County Jail inmate was injured after being hit by a falling tree during a voluntary roadside clearing project. 201 S.W.3d at 472–73. Sloas brought suit against the deputy jailer overseeing the work project, alleging negligent supervision.

Finally, we cannot accept, as Appellee suggests, that the reasoning in *Jones v. Lathram,* 150 S.W.3d 50 (Ky.2004) should similarly apply here.[15] Driving a motor vehicle is clearly one of the most intensely regulated, trained, tested, and supervised activities that an individual may perform. *See generally* KRS Title XVI (motor vehicles). Aside from the basic instructions to Night Hike and its brief demonstration to the counselors, there can be no legitimate argument that even vaguely similar regulatory, training, testing, or supervisory systems were in place here so as to limit or define Haney's decision-making in supervising the children's activity.

As should now be clear, the question of whether a particular act or function is discretionary or ministerial in nature is and, indeed, should be, inherently fact-sensitive. Both the trial court and the Court of Appeals simply concluded that Haney's supervisory duties in conducting the Night Hike activity were made ministerial by virtue of her being trained. Yet, without more, this should not halt further analysis and, to be sure, if it did, potentially all public employees and officials could be subject to suit. Rather, a court must continue on and examine the training imparted as it related to the acts or functions alleged as tortious or directly causing the event, all in an effort toward determining whether the training actually left the employee or official with significant discretion regarding the act or function at issue.

## VI. Conclusion

For the foregoing reasons, the decisions of the Court of Appeals and the Jefferson Circuit Court are hereby reversed and this matter is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. ABRAMSON, CUNNINGHAM, NOBLE, and VENTERS, JJ., concur.

MINTON, C.J., concurs in the result reached by the majority consistent with his separate concurring opinion in *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage,* 286 S.W.3d 790 (Ky.2009), and SCHRODER, J., joins.

---

15. In *Jones,* this Court held that a police officer's response "to an emergency call for assistance from a fellow officer" was a ministerial act. *Id.* at 53. *Jones* held that "the act of safely driving a police cruiser, even in an emergency, is not an act that typically requires any deliberation or the exercise of judgment", as "driving a police cruiser requires reactive decisions based on duty, training, and overall consideration of public safety." *Id.* This Court has since reaffirmed the holding in *Jones. See Pile,* 215 S.W.3d at 40; *see also Com., Transp. Cabinet, Dept. of Highways v. Sexton,* 256 S.W.3d 29, 33 (Ky.2008).