NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0171n.06

No. 19-6016

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 25, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| GEORGE DORDONI, Individually | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee | ) | |

BEFORE: GRIFFIN, WHITE, and NALBANDIAN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant John Doe[1] appeals from an order granting official immunity to Appellee George Dordoni, a Senior International Student and Scholar Advisor at the WKU International Student Office, and dismissing Doe's complaint. The district court concluded that Dordoni was entitled to official immunity because the acts he performed in advising Doe were discretionary. Because we conclude that Dordoni's actions were ministerial, he is not entitled to official immunity, and we **REVERSE** and **REMAND** for further proceedings.

**I.**

Doe was born in Saudi Arabia, moved with his family to Islamabad, Pakistan, and eventually became a Pakistani citizen. Although his parents are devout Muslims and Doe was

---

[1] The district court allowed Doe to proceed pseudonymously due to his fear of religious persecution.

raised in strict adherence to Islam, Doe befriended a Pakistani Christian and became interested in converting to Christianity. In 2013, Doe came to the United States to pursue an engineering degree at Western Kentucky University ("WKU").[2] After arriving, Doe began attending Christian services. Although he initially kept his interest in Christianity a secret, after some time Doe informed his uncle, who later conveyed this information to Doe's father. This caused Doe's father to withdraw his financial support. Doe's father later requested that Doe return to Saudi Arabia because Doe's father and mother were separating, and his father had an important hearing. Doe's new financial difficulties and the stress occasioned by the news of his parents' separation led him to seek Dordoni's advice about taking a leave of absence while maintaining his status as a student. Following Dordoni's advice, Doe applied for and was granted a medical leave of absence for the Spring 2015 semester.

Before leaving for Saudi Arabia, Doe consulted with Dordoni again. Because of his medical leave of absence, Doe was unsure of his immigration status and wanted to confirm that he could "get back in the country if [he left.]" R. 84-2, PID 499. Dordoni responded that if Doe obtained a corrected[3] letter from the counseling center authorizing the leave of absence, Doe "would be able to take a brief leave from the [United States] for the purpose [he described] and return without any entry issues." *Id.* at PID 501. Doe obtained that corrected letter and later emailed Dordoni to ask about obtaining a "travel I-20" and a verification letter attesting to Doe's

---

[2] International students studying in the United States are given a Form I-20 (Certificate of Eligibility for Non-Immigrant (F-1) Student status). "An I-20 is a document that certifies an international student is currently enrolled at an American university and is thus eligible to return to the U.S. on a student visa." R. 102, PID 1219.

[3] The original letter from the counseling center authorizing the medical leave of absence was signed by an individual with a master's degree. However, the government now requires that this determination be made by an individual with a doctorate.

continuing status with the university. [4] *Id.* at PID 503-04. Dordoni responded that he would write a letter explaining Doe's continuing relationship with WKU and asked when Doe was planning to travel. Doe responded that he would depart after February 14, 2015, but he wondered if there was a deadline by which he had to return to the United States. Dordoni responded that Doe "can stay out of the country for as much as 5 months before [he] would need a new I-20 to be able to re-enter." *Id.* at PID 505.

Doe departed for Saudi Arabia on February 14, 2015. When he arrived, he discovered that his father's true purpose in having him return was to force Doe to conform to his Muslim upbringing. To this end, Doe was beaten, placed on "house arrest" and overseen by a security guard for the next three months. R. 84-1, PID 339. To escape the situation, Doe told his father that his conversion to Christianity was just a prank and signed a letter promising he would adhere to Islam and return to Saudi Arabia after completing his degree. After Doe signed this letter, his father consented to Doe's return to the United States.

Two weeks after Doe departed for Saudi Arabia, Dordoni discovered a problem with WKU's iStart/Sunapsis system. [5] The iStart program is "a software program used by WKU to track the status of international students enrolled at the university." R. 102, PID 1220. It is designed to interface with the Student and Exchange Visitor Information System ("SEVIS"), a government program controlled by Immigration and Customs Enforcement (ICE), used to track the status of international students within the United States. This allows WKU and the government to exchange student information and records. Because of a glitch, 1,039 students' records that were input into

---

[4] Dordoni was a Designated School Official, a designation that permitted him to endorse an international student's I-20, certifying that the student has a continuing relationship with the university and is authorized to return.

[5] Sunapsis and iStart are used interchangeably in the record.

iStart had not synced correctly with SEVIS, causing the students to appear as unregistered in SEVIS although they were shown as active in iStart.[6] Dordoni and WKU IT officials worked with Sunapsis personnel to resolve the glitch; by March 2015, Dordoni was informed by WKU IT that the problem had been resolved. He confirmed the fix by checking a few records in SEVIS to ensure that the students' statuses there matched their statuses in iStart. All did.

On May 10, 2015, Doe emailed Dordoni to inquire whether it was "safe to travel with the I-20 [he has]" because it would be expiring in a few days. R. 84-2, PID 516. Before responding, Dordoni checked Doe's status in iStart (but not SEVIS), which reflected that he was still an active student. Dordoni then responded that iStart showed that Doe's I-20 would not expire until 2017 and that Dordoni was trying to understand why Doe believed that his I-20 would shortly expire. Doe responded that he was using the I-20 from when he took the semester off because he had previously lost the I-20 he received at the beginning of his program. Dordoni did not respond to this email.

Doe returned to the United States on May 17, 2015, arriving at Washington Dulles airport. Doe presented his Pakistani passport and his I-20 to the Customs and Border Patrol ("CBP") agent, who directed Doe to secondary inspection because SEVIS records indicated that Doe was not a current student at WKU and that Doe's I-20 was terminated on April 27, 2015 by SEVIS maintenance for "failure to enroll." R. 84-8, PID 632; R. 84-2, PID 519, 522, 564, 567.[7]

---

[6] Because WKU has a significant number of international students and must certify for the government that the students are registered for classes each semester, it processes student registrations in batches. The glitch caused the batched registrations that were correctly uploaded into iStart to not be sent to the SEVIS system.

[7] Dordoni learned of Doe's detention that same day. After consulting both iStart and SEVIS and realizing that Doe's iStart status was "active" but his SEVIS status showed that Doe's visa status was "terminated," he immediately requested that Doe's SEVIS status be changed to active. R. 84-2, PID 519. The change was approved the following day. Dordoni also communicated with Doe by phone while he was at Dulles and even spoke to the CBP official on Doe's behalf.

At secondary inspection, the CBP officer asked Doe whether the I-20 belonged to him and whether it was valid. Doe responded that, according to his "immigration adviser," Dordoni, his I-20 was valid until 2017. R. 84-5, PID 567. The CBP official informed Doe that his I-20 was terminated and that he would be deported unless there was another basis on which he could be admitted. At this point, Doe began recounting the details of the prior three months and describing his conversion from Islam to Christianity. Because of Doe's statements, he was treated as an asylum-seeker, which triggered his detention pending a credible-fear interview. Doe spent the night at the airport before being transferred to an ICE holding facility and later a detention facility in Virginia. Doe ultimately retained an immigration attorney and was paroled from ICE custody on June 17, 2015. He was later granted asylum and is currently a lawful permanent resident.

Doe filed this lawsuit against Dordoni, alleging that Dordoni was negligent in advising Doe of his immigration status and his ability to re-enter the United States.[8] Following discovery, Dordoni moved for summary judgment asserting four independent arguments: (1) he is entitled to official immunity, (2) he acted with reasonable care and did not breach any duty owed to Doe, (3) Doe's asylum claim was an intervening act that constitutes a superseding cause, (4) Doe failed to prove he suffered any damages. The district court determined that Dordoni was entitled to official immunity under Kentucky law because his advising Doe regarding his immigration status was a discretionary act. The court concluded that "[t]he evidence in this case shows no failure on the part of Dordoni in the performance of his duties, except perhaps that he did not check SEVIS

---

[8] In his complaint, Doe contended that Dordoni owed Doe a duty of reasonable care in advising Doe through the I-20 application process, in rendering advice to Doe regarding his immigration status and ability to re-enter the country, and in providing accurate information to ICE's SEVIS system. Doe alleged that Dordoni breached that duty by "negligently providing false and misleading information to SEVIS regarding [Doe's] status as a student enrolled at WKU." R. 1, PID 7.

when advising Doe of his travel status." R. 102, PID 1226.[9] Because no WKU policy mandated that Dordoni check Doe's immigration status through SEVIS, the district court concluded that the action was discretionary because the act undertaken—ascertainment of Doe's status—could be performed in more than one way. The district court determined that because the act was discretionary and Doe did not contend that Dordoni acted in bad faith, Dordoni was entitled to official immunity. The court dismissed Doe's complaint, and Doe appeals.[10]

**II.**

We review the district court's grant of summary judgment de novo, "construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011)). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The district court granted summary judgment to Dordoni based on official immunity. As the district court recognized, "[a] determination of immunity depends upon classifying the challenged acts in one of two ways: discretionary or ministerial." R. 102, PID 1224. Thus, immunity "rests not on the status or title of the officer or employee, but on the function performed." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001).

---

[9] By the time the case reached the summary judgment stage, it appeared that the gravamen of Doe's argument was that Dordoni did not check SEVIS before responding to his inquiry.

[10] Because the district court granted Dordoni summary judgment on immunity grounds, it did not address any of Dordoni's other arguments; nor did it address competing motions to exclude the expert testimony of each side's experts, who opined on whether Doe's statements to CBP personnel were the cause of his detention.

Kentucky law affords official immunity to officers only "for acts performed in the exercise of their discretionary functions." *Id.* The immunity "applies to the negligent performance . . . of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* at 522 (citation omitted). Discretionary acts are those that "necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010). Discretion may also arise in the manner of the performance of an act "where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Id.* However, "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Yanero*, 65 S.W.3d at 522 (quoting *Franklin Cty. v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997)).

Official immunity does not apply to ministerial acts or functions that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* at 522 (citing *Malone*, 957 S.W.2d at 201). "That a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in nature." *Id.* (quoting *Upchurch v. Clinton Cty.*, 330 S.W.2d 428, 430 (Ky. 1959)). Because "most acts contain both discretionary and ministerial components, the court's 'analysis looks for the *dominant* nature of the act.'" *Estate of Collins v. Wilburn*, 755 F. App'x 550, 556 (6th Cir. 2018) (quoting *Haney*, 311 S.W.3d at 240). Kentucky courts have cautioned that "a proper analysis must always be carefully discerning, so as to not equate the act at issue with that of a closely related but differing act." *Haney*, 311 S.W.3d at 241. Moreover, courts must be careful not to "limit[] ministerial acts to almost nothing except

7

those acts that are directly compelled by an order or rule . . . under[mining] the rule that an act can be ministerial even though it has a component of discretion." *Marson v. Thomason*, 438 S.W.3d 292, 302 (Ky. 2014).

The act giving rise to Doe's negligence claim was Dordoni's inaccurate response to Doe's inquiry about whether it was safe for him to re-enter the country. Therefore, the dispositive question in this appeal is whether Dordoni's communication to Doe was a discretionary or ministerial function. Kentucky courts have not yet considered a claim of official immunity arising from similar facts. However, the closest case, *Kea-Ham Contracting, Inc. v. Floyd County Development Authority*, 37 S.W.3d 703 (Ky. 2000), leads us to conclude that this act was ministerial.

In *Kea-Ham*, the Floyd County Development Authority, a non-profit entity created to develop land for industrial and commercial uses, awarded an excavation contract to Kea-Ham Contracting, Inc. 37 S.W.3d at 705. Under the contract, the Authority was required to make "progress payments" to Kea-Ham as the stages of the work were completed. *Id.* To undertake the project, Kea-Ham obtained a bond from a bonding company that required assurances that sufficient funding was in place. *Id.* Kea-Ham sought such assurances from the Authority, and the Chairman of the Board of the Authority subsequently "wrote a letter to Kea-Ham's insurance agent representing that interim funding was in place at a local bank." *Id.* With this assurance secured, Kea-Ham began excavating, but the Authority failed to make its required interim payments. Kea-Ham subsequently learned that there was no funding in place and ceased its work on the project. *Id.*

Kea-Ham brought an action against the Authority and the Chairman for fraud, negligence, and breach of contract. The Authority and the Chairman filed motions to dismiss based on

sovereign and official immunity, and the Floyd Circuit Court granted the motions after converting them to summary judgment motions. *Id.* The Court of Appeals affirmed, and Kea-Ham appealed to the Kentucky Supreme Court. On appeal, the Authority and the Chairman argued that "[the Chairman's sending of the letter] was discretionary in nature because it required him to weigh the different courses of action available and then decide upon one instead of another." *Id.* at 707.

The Kentucky Supreme Court disagreed. It explained that although the Chairman "could have responded in a variety of ways, the act giving rise to the claim of liability was not the method chosen for communication of the information, but the fact of the communication" because "[the Chairman] exercised his discretion to undertake a simple, straightforward, administrative task of conveying a positive or negative response to the important question of whether interim financing was in place." *Id.* Because the act was the "conveyance of unambiguous, concrete information," the Kentucky Supreme Court held that this act was "purely ministerial" and involved only the "'execution of a specific act arising from fixed and designated facts,' *i.e.*, the communication of whether or not interim financing had been secured." *Id.* at 708.

In the same way that the Chairman's conveyance of inaccurate information to Kea-Ham was a purely ministerial act, so too was Dordoni's incorrect statement to Doe that his I-20 remained valid. In both cases, the officials undertook a simple, straightforward, administrative task of giving a positive or negative response to an inquiry they received. It is true that, unlike in *Kea-Ham*, Dordoni had to ascertain the facts that would be communicated to Doe and that he had two possible ways to determine those facts. But Kentucky courts have cautioned that an act does not become discretionary merely because there is a necessity for the ascertainment of certain facts. *Upchurch*, 330 S.W.2d at 430. Nor does the fact that Dordoni had "some discretion with respect to the means or method to be employed" in making that determination render an otherwise ministerial act

discretionary. *Yanero*, 65 S.W.3d at 522 (citing *Malone*, 957 S.W.2d at 201). To the extent that Dordoni's actions involved some modicum of discretion, the dominant nature of the act was still ministerial, so Dordoni is not entitled to official immunity.

Dordoni contends that even if he is not entitled to official immunity, he is still entitled to summary judgment on Doe's negligence claim because of the other reasons he advanced in the district court: (1) he acted with reasonable care and did not breach any duty he owed Doe; (2) Doe's asylum claim was an intervening act that constitutes a superseding cause; and (3) Doe failed to prove he suffered damages. These are matters best addressed by the district court in the first instance.

**III.**

For the foregoing reasons, we **REVERSE** the district court's grant of official immunity to Dordoni and **REMAND** for further proceedings.