RENDERED: JANUARY 27, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1137-MR

COMMONWEALTH OF KENTUCKY
TRANSPORTATION CABINET                                             APPELLANT


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
                    ACTION NO. 21-CI-000476


ESTATE OF ZAVIER FROEBER;
AND COMMONWEALTH OF
KENTUCKY, PUBLIC PROTECTION
CABINET, BOARD OF CLAIMS                                           APPELLEES


                              OPINION
                             AFFIRMING

                         ** ** ** ** **

BEFORE: ACREE, CALDWELL, AND LAMBERT, JUDGES.

CALDWELL, JUDGE: This case involves the tragic death of a young man, Zavier

Froeber, which occurred when his vehicle was struck by a train. The Estate of

Zavier Froeber (hereinafter "the Estate") alleged that the Appellant, the Kentucky

Transportation Cabinet (hereinafter "Transportation Cabinet") was liable to the

Estate for the death because it negligently failed to warn Zavier of the approaching train as he exited a work zone. The Board of Claims agreed, finding the Transportation Cabinet 20% responsible for the accident, apportioning the remaining 80% of responsibility to the decedent. The Jefferson Circuit Court affirmed the order of the Board of Claims.[1] The Transportation Cabinet now appeals pursuant to KRS 49.160.

**FACTS**

On March 29, 2016, 19-year-old Zavier Froeber was driving northbound on KY-1020 in Bullitt County on his way to attend a mandatory work meeting at his place of employment. He encountered a Transportation Cabinet work zone as he approached the final turn to his workplace, Sabert Corporation, which is located off Blue Lick Road. After Zavier turned left onto Blue Lick Road, his vehicle was immediately struck by a train, and he was killed. At the time of the accident, Zavier was less than a mile from Sabert Corporation's location.

Transportation Cabinet employees had set up a work zone to do work excavating a ditch on the shoulder of northbound KY-1020, a state highway. The Transportation Cabinet had received reports of water collecting in the shallow

---

[1] In 2021, the former Claims Commission was replaced by the Office of Claims and Appeals, Board of Claims. *See* Kentucky Revised Statutes ("KRS") 12.020, KRS 13B.020, and KRS 49.010 *et seq.*

-2-

ditch between the road and the railway, flooding the road. The railway ran parallel to KY-1020 and intersected Blue Lick Road.

After holding a meeting concerning how to properly conduct the work in the work zone, the Transportation Cabinet employees had erected signage on KY-1020 indicating to drivers they were approaching a work zone; the road would narrow to one lane, and traffic onto the lane would be controlled by flaggers. One flagger, Jeremy Nichols, was positioned beside the northbound lane on the south end of the zone and equipped with a "slow/stop" paddle. Another employee, Paul Beckham, was similarly equipped and positioned on the west side of the road by the southbound lane. Both flaggers had a pick-up truck beside them with lights flashing.

A dump truck and a backhoe were in the closed northbound lane, along with Nichols' pick-up truck. Zavier proceeded north, now travelling in the southbound lane as directed by Nichols; all traffic was directed to the southbound lane, with the flaggers communicating via radio as to which of them would allow traffic to proceed and which would turn his paddle to "stop."

Beckham was responsible for controlling southbound traffic, as well as traffic turning left onto KY-1020 and into the work zone from East Blue Lick Road, which ran perpendicular to KY-1020 to the east. Traffic on East Blue Lick Road would have to cross railroad tracks which ran across Blue Lick Road just

before it ended at the junction with KY-1020. The railroad tracks were about forty-five feet from KY-1020. Beckham also had to control traffic leaving an auto service business to the west of KY-1020. Nichols was responsible for controlling northbound traffic on KY-1020, as well as traffic entering and leaving Solite Corporation, which was located at the southern edge of the work zone.

Zavier's vehicle was not the lead vehicle when northbound traffic was released to proceed but was either the second or third vehicle. Megan Jones was stopped in the southbound lane by Beckham and was second in line behind another vehicle while they waited for northbound traffic to clear the lane. Megan Jones watched in horror as Zavier turned east onto Blue Lick Road and into the path of a northbound train. The crossing had lights and bells, which had activated. It had no gate.

Christopher Pollett is a highway superintendent and was in charge of the worksite. He would ensure the zone was properly set up, perform other supervisory duties, and then proceed to another worksite in his jurisdiction. He happened to be onsite at the time of the accident involving Zavier. He was in his Transportation Cabinet vehicle at the stop sign on Blue Lick Road, leaving the worksite to proceed to his next supervisory detail. He was waiting for Beckham to release him to turn left onto southbound KY-1020. He heard the train whistle and observed the lights of the crossing signal and so he pulled his truck up a bit closer

to KY-1020, to ensure the bed was not on the tracks. He made eye contact with Zavier as Zavier turned right onto Blue Lick Road. He briefly saw the collision in his rear-view mirror as the train slammed into Zavier's vehicle.

No Transportation Cabinet employee on the worksite gave any warnings about the train to any vehicles proceeding through the worksite. Though the dump truck and excavator were approximately eleven feet tall and were occupying the space between traffic and the railroad tracks, effectively blocking the view of those travelling through the work zone, no employee believed they had any duty to warn motorists as to the approach of the train as it was not located on the worksite. The worksite ended, they believed, before the railroad tracks and Blue Lick Road was not a part of the work zone, though the southbound flagger had to control traffic entering KY-1020 from Blue Lick, whether proceeding north or southbound on KY-1020.

The Estate filed a claim with the Kentucky Board of Claims (formerly the Kentucky Claims Commission, hereinafter "the Board"). The Estate claimed that the Transportation Cabinet employees were negligent in setting up the work zone, which led to Zavier's view of the train being obstructed. The Estate also alleged that the activity of the work zone created distractions and confusion which increased the likelihood that a driver would miss the alerts that a train was approaching from the rear, and that the Transportation Cabinet employees failed to

warn Zavier about the approaching train. The Transportation Cabinet admitted it owed an ordinary duty of care to all drivers passing through the work zone but disclaimed any responsibility for drivers' safety once they had left the work zone. The Transportation Cabinet specifically denied it was negligent in any way which led to the death of Zavier.

On October 30 and 31, 2019, the Board held a hearing on the claim. The Estate called Andrea Davis, formerly of the human resources department at Zavier's employer, Sabert Corporation, to establish his earnings. The Estate also called six Transportation Cabinet workers present at the time of the accident: Christopher Pollett, who was the Bullitt County supervisor; Raymond Allen, who was the on-site supervisor; flaggers Jeremy Nichols and Paul Beckham; dump truck operator James Lawson; and backhoe operator William Peabody. The Estate also presented the testimony of accident reconstructionist Joseph Stidham, a retired Kentucky State Trooper and reconstruction trainer, and Megan Jones, who witnessed the accident. Zavier's mother, Bridgett, and his father and executor of his estate, Scott, also testified. The Transportation Cabinet called only Christopher Pollett and its retained expert, Kenneth Agent.

Following the hearing, the hearing officer issued findings of fact, conclusions of law and a recommended order which found the Transportation Cabinet twenty percent responsible for the accident. In so finding, the hearing

officer found the Transportation Cabinet violated Section 6B.01(5) of the Manual

on Uniform Traffic Control Devices for Streets and Highways ("MUTCD"), which

is the standard by which the Transportation Cabinet operates.[2]  The hearing officer

further found:

> In this case, the Hearing Officer concludes that the
> obligation of the Respondent to warn motorists of
> foreseeable dangers in or immediately adjacent to its
> work zone was ministerial.  Its employees may well have
> had discretion in how they went about giving those
> warnings, but they were not free to fail to do so at all.

The Hearing Officer reasoned that the Transportation Cabinet had

failed to warn motorists of foreseeable dangers, *i.e.*, a train approaching and the

view of said train being obstructed by the equipment, as well as the distraction of a

work zone.  The hearing officer apportioned eighty percent of the fault to Zavier.

The hearing officer found the duty to warn to be a ministerial function of the

Transportation Cabinet.  The hearing officer found that the future earning capacity

---

[2] KRS 189.337; 603 Kentucky Administrative Regulations ("KAR") 5:050 ("This administrative regulation establishes that the MUTCD shall be the uniform system of traffic control devices in Kentucky.").  Section 6B.01(05) of the MUTCD contains Fundamental Principles of Temporary Traffic Control and reads as follows:

> Road user and worker safety and accessibility in TTC zones should be an integral
> and high-priority element of every project from planning through design and
> construction.  Similarly, maintenance and utility work should be planned and
> conducted with the safety and accessibility of all motorists, bicyclists, pedestrians
> (including those with disabilities), and workers being considered at all times.  If
> the TTC zone includes a grade crossing, early coordination with the railroad
> company or light rail transit agency should take place.

of Zavier had been $956,800 over his expected natural life span, and awarded the Estate twenty percent of that amount, or $191,360.[3]

The Board of Claims adopted the hearing officer's recommendation in a final order issued December 22, 2020. The Transportation Cabinet timely appealed that determination to the Jefferson Circuit Court. After allowing pleadings and conducting oral arguments, the Jefferson Circuit Court affirmed the Board. The matter was then appealed to this Court. We affirm.

## STANDARD OF REVIEW

The standard of review for appeals from the Board of Claims is limited in scope as to whether the factual findings of the Board are supported by substantial evidence and whether the conclusions based thereon were clearly erroneous. *Department for Human Resources v. Redmon*, 599 S.W.2d 474, 476 (Ky. App. 1980). Additionally, even if a reviewing court might disagree with the conclusion reached by the Board, it is not to substitute its judgment for that of the Board. *Commonwealth, Department of Highways v. General & Excess Insurance Co.*, 355 S.W.2d 695, 699 (Ky. 1962). With this standard in mind, we begin our analysis.

---

[3] The statute controlling at the time of the incident was KRS 44.070(5), which limited recovery to $200,000.

## ANALYSIS

Generally, the Commonwealth and its Cabinets and agencies enjoy immunity from lawsuits.  *See Yanero v. Davis*, 65 S.W.3d 510, 517-18 (Ky. 2001).[4]

> Section 231 of the Kentucky Constitution provides that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth."  Under this section, "no one can sue the State without its consent, which is usually given by a joint resolution of the General Assembly." *Bach v. Bach,* 288 S.W.2d 52, 54 (Ky. 1956).

*Commonwealth Labor Cabinet v. Morris*, 215 S.W.3d 49, 52 (Ky. App. 2006).

> The Board of Claims was created by statute:
>
> The Board of Claims created by KRS 49.010 shall have the following powers and authority to investigate, hear proof, and compensate persons for damages sustained to either person or property as a proximate result of negligence on the part of the Commonwealth, any of its cabinets, departments, bureaus, or agencies, or any of its officers, agents, or employees while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies; except, however, regardless of any provision of law to the

---

[4]    [S]overeign immunity is a concept that arose from the common law of England and was embraced by our courts at an early stage in our nation's history.  [*Reyes v. Hardin Memorial Hospital*, 55 S.W.3d 337, 338 (Ky. 2001)].  It is an inherent attribute of a sovereign state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity.  Restatement (Second) of the Law of Torts § 895B(1) (A.L.I. 1979); 72 Am.Jur.2d, *States, Territories, and Dependencies*, § 99 (1974).  This principle was recognized as applicable to the Commonwealth of Kentucky as early as 1828. *Divine v. Harvie*, 23 Ky. (7 T.B. Mon.) 439, 441 (1828).

*Id.* at 517-18.

contrary, the Commonwealth, its cabinets, departments, bureaus, and agencies, and its officers, agents, and employees, while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies, shall not be liable for collateral or dependent claims which are dependent on loss to another and not the claimant or damages for mental distress or pain or suffering, and compensation shall not be allowed, awarded, or paid for such claims for damages.

KRS 49.020(5).[5]

Our review of the determination of the Board of Claims and the circuit court's affirmance thereof is limited. Only if we find that the Board acted without power, or in excess of its granted powers, that fraud was perpetrated to extract the award, or that the findings of fact of the Board fail to support the determination, or we find that the award is contrary to the provisions of the statutes establishing the

---

[5] Formerly KRS 44.070(1):

A Board of Claims, composed of the members of the Crime Victims Compensation Board as hereinafter provided, is created and vested with full power and authority to investigate, hear proof, and to compensate persons for damages sustained to either person or property as a proximate result of negligence on the part of the Commonwealth, any of its cabinets, departments, bureaus, or agencies, or any of its officers, agents, or employees while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies; provided, however, regardless of any provision of law to the contrary, the Commonwealth, its cabinets, departments, bureaus, and agencies, and its officers, agents, and employees, while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies, shall not be liable for collateral or dependent claims which are dependent on loss to another and not the claimant, damages for mental distress or pain or suffering, and compensation shall not be allowed, awarded, or paid for said claims for damages . . . .

-10-

Board of Claims may the award be reversed.  KRS 49.150(5).  The Transportation

Cabinet argues that the findings of fact do not support the determination in that the

acts here were not ministerial, but discretionary.

"In any appeal from a decision of the [Board of Claims], the critical

inquiry is whether the allegedly negligent act is discretionary or ministerial."

*Commonwealth v. Russell*, 578 S.W.3d 747, 750 (Ky. App. 2019).

> In recent years, very little has been added to improve upon the explanation given more than 50 years ago by our predecessor court in *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959), and we find it worth repeating here:
>
> > The essentials of a ministerial as contrasted with a discretionary act are thus set forth in 43 Am.Jur., Public Officers, sec. 258, p. 75: 'An official duty is ministerial when it is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts; that a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in its nature. Discretionary or judicial duties are such as necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.  However, an act is not

-11-

necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means or method to be employed.

*Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628, 633-34 (Ky. 2014).

It is uncontroverted that the Manual on Uniform Traffic Control Devices is "the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel[.]" 23 C.F.R.[6] § 655.603 (2010). KRS 189.337(2) requires the Department of Highways to "promulgate and adopt a manual of standards" for control of traffic devices. The Transportation Cabinet complied with KRS 189.337(2) in 603 KAR 5:050. "The MUTCD published by the Federal Highway Administration shall be the standard for all traffic control devices installed on any street, highway, bicycle trail, or private road open to public travel in Kentucky." 603 KAR 5:050 § 2(2)(a) (2013 version). Thus, employees of the Cabinet must act in compliance with the dictates of the MUTCD. The only question here is whether the Board correctly determined, and the circuit court affirmed, that the decision not to warn motorists traversing through the worksite was discretionary, and thus not a matter which subjects the Cabinet to liability.

---

[6] Code of Federal Regulations.

The Transportation Cabinet insists that the decisions made at the subject worksite were a matter of discretion, and that it cannot therefore be held liable for any negligence which occurred. The evidence adduced at the hearing establishes that the employees working the site that day in no way prepared for the eventuality of a train arriving adjacent to the worksite. The Transportation Cabinet argues that since the railroad track was without the work zone proper, it had no duty to warn motorists of an approaching train, regardless of whether the activity and equipment of the worksite impeded the view of or the warnings attendant to the arrival of a train at a crossing.

The hearing officer concluded that "if the [Transportation Cabinet] is negligent inside of its work zone, and as a result causes injury or damage to a motorist outside the work zone, especially if he has just left the work zone, the [Transportation Cabinet] would be liable for such injury." In short, the Board found that it matters not if the injury or accident occurs within the work zone, so long as the failure to warn occurred within the worksite and is a direct cause of the injury. The circuit court affirmed this finding. We cannot say this finding was clearly erroneous.

It was the complete failure of those at the work zone to foresee the reasonable likelihood that a train would appear on the tracks adjacent to the worksite and that the equipment and activity associated with the operation might

-13-

occlude the perception of the arrival of the train by motorists. The tracks, only forty-five feet from KY-1020, were just adjacent to the worksite. The proximity of the tracks to the worksite is relevant here. If the tracks had been further away – we cannot say how far, the facts of each particular case determine relevance – we may well have agreed with the Transportation Cabinet's position. However, as the circuit court pointed out:

> The record reflects that the KTC did not consider the safety of motorists or warn them about the danger of turning right onto East Blue Lick Road as [Z]avier did while there was an oncoming train, and that the danger of a collision was foreseeable as multiple trains passed through that crossing every day, many cars turned onto East Blue Lick Road from KY 1020 every day and there had been other accidents at that crossing. The position taken by the KTC and its employees that they bore no responsibility after motorists proceed through the work zone after being waived through by a flagger is contrary to the fundamental principles stated in Section 6B 01(05) of the MUTCD. The Hearing Officer's conclusion, as adopted by the Claims Commission, that the KTC was liable for breaching a ministerial duty within the work zone rendering it liable for damages because of [Z]avier's death which occurred immediately outside of the work zone is legally sound and supported by substantial evidence.

The proximity of the train to the worksite, coupled with the view of the tracks being obstructed by the dump truck and backhoe for northbound drivers, plus the inherent distraction of a worksite, all formed to require those employees working and supervising that day to recognize the foreseeable eventuality of a train

arriving adjacent to the worksite. One flagger was controlling traffic as soon as it crossed the railroad tracks from Blue Lick Road, and he clearly saw the train approaching from behind Zavier. Since the Transportation Cabinet employees had not discussed this eventuality in the meeting prior to beginning work, nothing was done to warn Zavier of the approaching train. However, when there is ongoing construction or maintenance work, the Department of Highways not only has this general duty, but also a specific duty, to warn motorists of known hazards. *Commonwealth, Dep't of Highways v. Young*, 354 S.W.2d 23, 24 (Ky. 1962) ("[T]hose charged with the maintenance of highways are under a duty to safeguard the traveling public while the highway is being repaired and anyone making repairs is under duty to observe proper precautions by the erection of suitable barriers or warning devices.").

The circuit court concluded its order:

The record reflects that the KTC breached its duty under Section 6B.01(05) of the MUTCD by failing to plan (for) the foreseeable contingency of a train coming through next to the work zone and a motorist turning onto East Blue Lick Road at the same time, by failing to plan of [sic] a motorist failing to notice a train, because of the partial obstruction created by the KTC's equipment and the distractions inherent in the work zone, and by failing to warn [Z]avier of such danger.

This conclusion of the circuit court finds support in the Supreme Court determination in *Gaither*, 447 S.W.3d at 636, holding that certain rules of safety are

> absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*[, 65 S.W.3d] at 522. It is "an essentially objective and binary directive." *Haney* [*v. Monsky*, 311 S.W.3d 235, 242 (Ky. 2010)]. You follow the rule or you violate it; there is no in-between area for discretion about how to comply. Adherence to the rule may require some modicum of forethought and planning, but it requires no judgment.

We believe the same in this instance – the duty to warn of an approaching train, the view of which your equipment will obstruct, and knowing the activity inherent in the work of the day will serve as a distraction to drivers – is so fundamental here as to be ministerial. Also, the hearing officer noted the evidence of other prior accidents between vehicles and trains at that crossing, making it ever more necessary to be cautious as to how the distraction of the worksite was ameliorated. The crew had discretion in *how* they planned to warn drivers and protect against accidents, but to not even contemplate the danger to motorists should a train approach is violation of an absolute, certain, and imperative duty. We affirm.

# CONCLUSION

We agree with the circuit court. The findings of the Board are supported by substantial evidence, and we discern no clear error in their conclusions of law. The award to the Estate is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Marlin A. Jones
Frankfort, Kentucky

BRIEF FOR APPELLEE ESTATE OF
ZAVIER FROEBER:

Vanessa B. Cantley
Patrick E. Markey
Louisville, Kentucky