RENDERED:  SEPTEMBER 19, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0597-MR

J. CHRIS LANE;[1] DARLENE
WEATHERS, AS ADMINISTRATRIX
OF THE ESTATE OF FREDERICK N.
O'BANNON, JR.; HEAVEN
O'BANNON; IESHA BOOKER, AS
MOTHER AND GUARDIAN OF J.O.
AND F.O. III; AND TONIKA
MITCHELL, AS MOTHER AND
GUARDIAN OF F.O.                                                   APPELLANTS


                          APPEAL FROM JEFFERSON CIRCUIT COURT
v.                        HONORABLE BRIAN C. EDWARDS, JUDGE
                               ACTION NO. 22-CI-002711


KENTUCKY DEPARTMENT OF
CORRECTIONS; AMBER RYAN, IN
HER OFFICIAL CAPACITY AND
INDIVIDUALLY; BRIAN
PATTERSON, IN HIS OFFICIAL
CAPACITY AND INDIVIDUALLY;
CHRISTOPHER MULL, IN HIS
OFFICIAL CAPACITY AND
INDIVIDUALLY; COOKIE CREWS,
IN HER OFFICIAL CAPACITY AND
INDIVIDUALLY; AND ERICA

---

[1]  James Chris Lane.

HARGIS, IN HER OFFICIAL
CAPACITY AND INDIVIDUALLY                                    APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND A. JONES, JUDGES.

JONES, A., JUDGE:  This appeal arises from a tragic shooting on November 29, 2021, during a highway construction project in Jefferson County, Kentucky. While off duty and engaged in a private traffic-control assignment, Officer James Lane was shot in the face and critically injured.  Frederick O'Bannon, a civilian working on the same construction site, was shot and killed.  The shooter, Keyshaun Stewart, was a felony probationer under the supervision of the Kentucky Department of Corrections (KDOC) at the time.

O'Bannon's Estate and Lane filed suit against KDOC and several of its employees, alleging negligence, negligent supervision, and vicarious liability for failing to adequately monitor and respond to Stewart's probation violations. The Jefferson Circuit Court granted summary judgment in favor of all defendants. Appellants seek review of that decision as a matter of right.

For the reasons set forth below, we affirm the dismissal of Appellants' official-capacity claims and their individual-capacity claims against Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan.  We reverse

-2-

the dismissal of the individual-capacity claim against Officer Christopher Mull and remand that claim for further proceedings.

## I. BACKGROUND

### A. The Parties.

The Appellants are James Lane and the Estate of Frederick O'Bannon. At the time of these events, Lane was employed as a police officer and was working a private, off-duty traffic-control detail at a construction site on I-264 in Jefferson County. O'Bannon was a civilian contractor working as a paver on the same site.

The Appellees are KDOC and several of its current or former employees: Commissioner Cookie Crews; Director of Probation and Parole Erica Hargis; District 18 Supervisor Brian Patterson; District 18 Assistant Supervisor Amber Ryan; and Probation Officer Christopher Mull. Officer Mull was directly responsible for supervising Keyshaun Stewart, a high-risk probationer assigned to KDOC's Probation and Parole District 18. Appellants sued all KDOC employees in both their official and individual capacities.

### B. Factual and Procedural History.

On August 26, 2019, Keyshaun Stewart was sentenced in Jefferson Circuit Court to a five-year term of probation following convictions for third-degree burglary, first-degree possession of a controlled substance

(methamphetamine), and third-degree criminal mischief. Stewart was classified as a high-risk probationer and placed under the supervision of KDOC's Probation and Parole District 18, with Probation Officer Christopher Mull assigned as his supervising officer.

Under KDOC policy and the terms of his probation, Stewart was required, among other things, to report regularly, refrain from criminal activity, notify his officer of any arrests, avoid possession of firearms, and remain in Kentucky unless given permission to leave the state. Despite these conditions, Stewart was arrested in Davidson County, Tennessee, on May 31, 2020, and charged with aggravated assault and arson. He remained incarcerated there until August 11, 2020.

Although Officer Mull filed a violation report in July 2020 citing Stewart for absconding and failing to report, he failed to mention Stewart's arrest or incarceration in Tennessee. Officer Mull's violation report, lacking any reference to Stewart's pending felony charges in Tennessee, prompted the Commonwealth's motion to revoke Stewart's probation, and a revocation hearing was scheduled.[2] Although it is unclear whether Officer Mull knew of the Tennessee charges when he filed his report, it is undisputed that he later received

---

[2] The revocation hearing was originally scheduled for September 15, 2020, but was continued to November 4, 2020.

-4-

confirmation of them from another probation officer, yet he took no action to supplement his report or notify either the circuit court or the Commonwealth. When Stewart pled guilty to the Tennessee charges on September 16, 2020, that information likewise went unreported.

On November 4, 2020, the Jefferson Circuit Court held a hearing on the Commonwealth's motion to revoke Stewart's probation, which was based solely on his absconding from supervision. Officer Mull did not appear. After noting that Stewart had reestablished contact with Probation and Parole, the Commonwealth withdrew its motion on the condition that Stewart remain compliant with his reporting obligations. No mention was made at the hearing of Stewart's arrest in Tennessee or his guilty plea.

In June 2021, Stewart was sentenced in Tennessee to four years' probation. As part of that sentence, he was ordered to serve his probationary term under the supervision of KDOC in Jefferson County, Kentucky. On July 29, 2021, Stewart's Tennessee conviction was entered into the Interstate Compact Offender Tracking System (ICOTS), a web-based system that facilitates the transfer of supervision for probationers and parolees from one state to another, and he was formally transferred to KDOC supervision.[3] On August 5, 2021, Officer Mull

---

[3] "Each year, the 50 states and 3 territories that comprise the Interstate Compact for Adult Offender Supervision (ICAOS) use ICOTS to process approximately 150,000 transfer requests

received an ICOTS assignment email notifying him that Stewart had been formally convicted in Tennessee and would be serving his probationary sentence in Kentucky under KDOC supervision. Six days later, on August 11, 2021, Officer Mull formally accepted the ICOTS assignment, assuming responsibility for supervising Stewart's Tennessee probation in Jefferson County. Despite accepting the ICOTS assignment, Officer Mull did not report Stewart's Tennessee conviction as required by KDOC procedures.

In the months that followed, Stewart received a speeding citation, was caught driving on a suspended license, failed to appear in court, and ultimately failed to report to Officer Mull in mid-November. A bench warrant for his arrest was issued on November 5, 2021.

On November 29, 2021, Stewart shot and killed O'Bannon and critically injured Lane at a construction site in Jefferson County. Following the shooting, KDOC conducted an internal investigation. The Department concluded that Officer Mull had failed to report Stewart's Tennessee charges as required by departmental policy and later misrepresented that he had disclosed those charges to the court during the revocation process. As a result, KDOC terminated Officer Mull's employment.

_____

and more than 1,000,000 compact activities for nearly 102,000 active supervision cases." https://interstatecompact.org/icots/what-is-icots (last visited Aug. 25, 2025).

Lane filed a complaint against KDOC and several of its employees on June 1, 2022, in Jefferson Circuit Court. The complaint was later amended to add O'Bannon's Estate as a co-plaintiff. As amended, the complaint asserted claims for negligence, negligence *per se*, vicarious liability, and negligent hiring, supervision, and retention against KDOC, Commissioner Crews, Director Hargis, Supervisor Patterson, Assistant Supervisor Ryan, and Officer Mull. The KDOC employees were sued in both their individual and official capacities.

On May 21, 2024, the Jefferson Circuit Court granted summary judgment in favor of all defendants. The court concluded that KDOC and the individual defendants sued in their official capacities were entitled to sovereign immunity. It further determined that no special relationship existed between the defendants and the victims sufficient to impose a legal duty, and that the individual defendants were therefore not liable as a matter of law. The court declined to reach the issue of qualified immunity and found insufficient evidence to support Appellants' negligent hiring and vicarious liability claims. This appeal followed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." CR[4] 56.03. The movant bears the initial burden of demonstrating that there is no genuine issue of material fact in dispute.

The party opposing the motion then has the burden to present "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 482 (Ky. 1991); *Watson v. Landmark Urology, P.S.C.*, 642 S.W.3d 660, 666 (Ky. 2022). "A party responding to a properly supported summary judgment motion cannot merely rest on the allegations in its pleadings." *Versailles Farm Home & Garden, LLC v. Haynes*, 647 S.W.3d 205, 209 (Ky. 2022) (citing *Continental Cas. Co. v. Belknap Hardware & Mfg. Co.*, 281 S.W.2d 914, 916 (Ky. 1955)). "[S]peculation and supposition are insufficient to justify a submission of a case to the jury, and . . . the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation." *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (quoting *Chesapeake & Ohio Ry. Co. v. Yates*, 239 S.W.2d 953, 955 (Ky. 1951)).

"An appellate court's role in reviewing a summary judgment is to determine whether the trial court erred in finding no genuine issue of material fact exist[ed] and the moving party was entitled to judgment as a matter of law."

---

[4] Kentucky Rules of Civil Procedure.

*Feltner v. PJ Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018). The standard of review is *de novo* because only legal issues are involved. *Isaacs v. Sentinel Ins. Co. Ltd.*, 607 S.W.3d 678, 681 (Ky. 2020).

Whether a duty exists is a question of law, reviewed *de novo*. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). So too is the determination of whether the public duty doctrine or a special relationship exception applies. *McCuiston v. Butler*, 509 S.W.3d 76, 80 (Ky. App. 2017). Similarly, whether a public employee's conduct was discretionary or ministerial for purposes of qualified immunity is a legal question subject to *de novo* review. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001); *Haney v. Monsky*, 311 S.W.3d 235, 241 (Ky. 2010).

## III. ANALYSIS

### A. Scope of Appeal.

At the outset, we note that Appellants have not challenged the circuit court's dismissal of any claims against KDOC or the official-capacity claims against the individual Appellees.[5] They have also expressly conceded all claims—both individual- and official-capacity—against Commissioner Crews.

---

[5] Kentucky law affords absolute sovereign immunity to the Commonwealth and its officials sued in their official capacities unless immunity is expressly waived by the General Assembly. *Commonwealth v. Whitworth*, 74 S.W.3d 695, 699 (Ky. 2002). No waiver applies here, and none has been identified by appellants. Dismissal of the official-capacity claims was therefore proper.

Accordingly, the only claims properly before this Court concern the circuit court's entry of summary judgment in favor of Director Hargis, Supervisor Patterson, Assistant Supervisor Ryan, and Officer Mull.

Appellants contend that genuine issues of material fact preclude summary judgment on their claims for negligence, negligent supervision, and vicarious liability, and that the circuit court erred in concluding these Appellees owed no legal duty to Appellants as a matter of law. Appellees respond that the circuit court correctly determined the duty issue. They further argue that, with respect to Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan, it was unnecessary for the circuit court to reach the duty question because, even assuming a duty was owed, these three Appellees are entitled to qualified immunity as the challenged conduct involved discretionary acts undertaken within the scope of their authority.[6]

**B. Qualified Immunity.**

When a government official or employee is sued in his or her individual capacity, Kentucky law provides for qualified immunity, which "affords

---

[6] The circuit court analyzed the case under the public duty doctrine without first addressing the Appellees' qualified immunity arguments. Qualified immunity is not merely a defense to liability; it is an immunity from suit, shielding officials from the burdens of litigation. *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 487 (Ky. 2006). The public duty doctrine, by contrast, is a substantive defense on the merits, negating the element of duty in a negligence claim. *McCuiston*, 509 S.W.3d at 80. Accordingly, the proper analytical sequence is to address immunity first, and we proceed in that order.

protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Haney*, 311 S.W.3d at 240 (quoting *Yanero*, 65 S.W.3d at 522). A public employee is entitled to qualified official immunity for the alleged negligent performance of duties when three elements are satisfied: (1) the acts in question are discretionary in nature, (2) undertaken in good faith, and (3) within the scope of the employee's authority. *Morales v. City of Georgetown*, 709 S.W.3d 146, 154 (Ky. 2024). Conversely, no immunity attaches for the negligent performance of a ministerial act. *Yanero*, 65 S.W.3d at 522.

The analysis of qualified official immunity follows a two-step process. First, courts determine whether the defendant was a government employee acting within the scope of his authority and whether the act was discretionary or ministerial. If the act is ministerial, the inquiry ends, and the court does not proceed to consider negligence. *Sheehy v. Volentine*, 706 S.W.3d 229, 237 (Ky. 2024). If the act is discretionary, the burden shifts to the plaintiff to produce evidence that it was not performed in good faith. *Yanero*, 65 S.W.3d at 523. As emphasized in *Sheehy*, "[t]hese two steps must not be confused. The first has the burden upon the defendant but does not consider the actions of the defendant, *i.e.*, whether they were negligent or acting in good faith. The second step shifts the burden to the plaintiff only after the defendant has made a *prima*

-11-

*facie* showing that his actions were discretionary and within the scope of his authority." *Sheehy*, 706 S.W.3d at 237.

A discretionary act is one that involves the exercise of personal judgment, deliberation, and decision-making. *Morales*, 709 S.W.3d at 154 (quoting *Yanero*, 65 S.W.3d at 522); *Armstrong v. Estate of Ifeacho by and through Ifeacho*, 633 S.W.3d 333, 339 (Ky. App. 2021). In contrast, a ministerial act is performed under absolute, certain, and imperative requirements, leaving no room for personal judgment, and involves merely executing a specific act arising from fixed and designated facts. *Morales*, 709 S.W.3d at 154; *Peterson v. Foley*, 559 S.W.3d 346, 349 (Ky. 2018). A ministerial function is one the employee must perform "without regard to his or her own judgment or opinion concerning the propriety of the act to be performed." *Bryant v. Louisville Metro Hous. Auth.*, 568 S.W.3d 839, 851 (Ky. 2019) (citation omitted).

Because few acts are purely discretionary or purely ministerial, courts determine the "dominant nature of the act" by examining agency policies, procedures, and the degree of discretion typically exercised in performing the function. *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 832 (Ky. 2021) (quoting *Haney*, 311 S.W.3d at 240); *Morales*, 709 S.W.3d at 155, 161.

***1. Individual Capacity Claims Against Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan.***

Appellants allege that Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan were negligent in their supervision of Officer Mull and in their handling of various internal reporting and documentation responsibilities within Probation and Parole. More specifically, Appellants contend these Appellees failed to correct or detect issues within certain electronic information systems and failed to file or ensure the accuracy of certain internal reports concerning Stewart's status as a probationer. They argue these failures enabled Officer Mull to continue supervising Stewart and Stewart's subsequent convictions to go undetected, ultimately allowing the events underlying this litigation to occur.

The actions challenged by Appellants fall squarely within the scope of discretionary functions protected by qualified official immunity. Supervising the conduct of others is a duty largely left to the independent discretion and judgment of the individual supervisor. *Haney*, 311 S.W.3d at 244. As recently reaffirmed by the Kentucky Supreme Court, deciding when, how, or to what degree one will supervise subordinates is an inherently discretionary function deserving of qualified official immunity. *Morales*, 709 S.W.3d at 158.

While Appellants suggest that certain reports and documentation were required, they identify no statute, regulation, or internal policy imposing an

absolute, certain, and imperative ministerial duty with respect to the creation, content, or review of those materials.  Nor do they cite any provision eliminating the exercise of judgment in how Director Hargis, Supervisor Patterson, or Assistant Supervisor Ryan were to use or manage KDOC's internal systems.  The discretion afforded in making supervisory decisions—including how to monitor subordinates, how to verify data, and when, and even if, to intervene or escalate concerns— underscores the discretionary nature of these functions.

Because Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan were acting within the scope of their discretionary authority, and Appellants have offered no evidence that their actions were taken in bad faith, these Appellees are entitled to qualified official immunity.[7]

## 2.  *Individual Capacity Claims Against Officer Mull.*

This brings us to Appellants' claims against Officer Mull.  Before addressing those claims substantively, we must first resolve a procedural matter. Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan are represented by Peter Ervin, who filed an appellees' brief on their behalf.  Officer Mull, however, is represented by Kevin Glogower, who neither filed a brief nor

---

[7] The same analysis applies to Appellants' vicarious liability claims.  "[P]ersons entitled to [qualified] official immunity cannot be held vicariously liable for the negligence of those employed by them, if they've employed persons of suitable skill." *Rowan Cnty.*, 201 S.W.3d at 476.

-14-

submitted any statement adopting the arguments of the other appellees. In fact, Counsel Glogower did not enter an appearance or take any affirmative action in this appeal until oral argument, when he appeared on Officer Mull's behalf. Although we permitted Counsel Glogower to very briefly address the Court to answer a few of our questions, we cautioned that appearing at oral argument without first filing a brief is highly irregular and improper. The purpose of oral argument is to allow the Court to question counsel about issues already briefed. Most assuredly, oral argument is not a substitute for briefing. Accordingly, we decline to consider any arguments Counsel Glogower made that differ from those presented by Counsel Ervin, who briefed all issues relevant to his clients.

When no responsive brief is filed, we may: (i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if the appellant's brief reasonably appears to support such action; or (iii) treat the appellee's failure as a confession of error and reverse without reaching the merits. RAP[8] 31(H)(3). The choice among these remedies lies within our discretion. *Lankford v. Lankford*, 688 S.W.3d 536, 537 n.1 (Ky. App. 2024). Here, we conclude the appropriate course is to accept Appellants' statement of the facts and issues, as they pertain to Officer Mull, as correct. Having dealt with this

---

[8] Kentucky Rules of Appellate Procedure.

procedural irregularity, we now turn to the substance of Appellants' individual-capacity claims against Officer Mull.

Unlike the supervisory Appellees, Officer Mull's alleged conduct involved the direct handling of Stewart's probation supervision. Appellants assert that Officer Mull failed to report Stewart's out-of-state conviction to the appropriate authorities and failed to take appropriate action in response to Stewart's noncompliance with the conditions of his probation. According to Appellants, KDOC policies required Officer Mull to report these developments, and his failure to do so was a proximate cause of the harms they suffered. As discussed above, the availability of qualified official immunity turns on whether the challenged conduct was discretionary or ministerial. "[A] ministerial act or function is one that the government employee must do 'without regard to his or her own judgment or opinion concerning the propriety of the act to be performed.'" *Bryant*, 568 S.W.3d at 851 (citation omitted). Where the duty is "absolute, certain, and imperative," qualified official immunity does not apply. *Yanero*, 65 S.W.3d at 522.

Here, KDOC's internal Probation and Parole Policies and Procedures Manual imposed an affirmative, nondiscretionary obligation on probation officers

to report subsequent criminal charges and convictions.[9] This mandatory reporting requirement leaves no room for deliberation or personal judgment. While Officer Mull's position may have required some preliminary assessment of the facts before reporting, the existence of such threshold evaluation does not convert the duty itself into a discretionary act. Kentucky law recognizes that ministerial duties may involve "the exercise of some judgment in the manner of carrying out the task" without altering their mandatory nature. *Yanero*, 65 S.W.3d at 522. Here, once the factual basis for a violation existed, Officer Mull's duty to report was purely ministerial. Moreover, the record affirmatively establishes that Officer Mull knew of the Tennessee charges and conviction long before the shooting, yet failed to report them. Because Officer Mull's duty to report was unquestionably ministerial, he is not entitled to qualified immunity.

## C. *The Public Duty Doctrine.*

Citing *Fryman v. Harrison*, 896 S.W.2d 908, 909 (Ky. 1995), the circuit court determined that because no special relationship existed between the

---

[9] Corrections Policies and Procedures 27-15-01(II)(C) and 27-15-01(II)(E)(1) require KDOC probation officers to report new arrests and new probation violations within ten days of notice. Similarly, Officer Mull had a statutory duty to file any reports required by the regulations. Kentucky Revised Statutes (KRS) 439.480(7).

victims, Lane and O'Bannon, and the public-official Appellees, the Appellees owed no affirmative legal duty to Appellants.[10] The court reasoned:

> [Appellants] were not in state custody or otherwise restrained by the state at the time of the incident, and Keyshaun Stewart was not a state actor. Therefore, there is no special relationship, and further, officials do not owe individual citizens a duty to protect them from crime absent said special relationship. Ultimately, because there are no facts that exist to support that a special relationship existed between the parties, summary judgment is appropriate as to the Defendants in their individual capacities.

05/21/2024 Order at 7.

Application of the public duty doctrine is not as straightforward as the circuit court's order suggests. The doctrine is intensely fact-specific, shaped by numerous exceptions, and, in Kentucky, complicated by the absence of a clearly defined rule or analytical framework. Rather than adopting a comprehensive test, our courts have applied the doctrine on an *ad hoc* basis, resolving only the issues necessary in each case. This makes reliance on any single precedent impractical; instead, guidance must be drawn from the body of decisions as a whole.

To apply the doctrine here, we begin with a general overview of its development and use in other jurisdictions. We then turn to Kentucky case law,

_____

[10] Since we have already concluded that Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan are entitled to qualified immunity, there is no need to address the public duty doctrine as it relates to their conduct. The remainder of this Opinion will be limited to considering the doctrine's applicability to Officer Mull.

-18-

supplementing our analysis, when appropriate, with decisions from states that approach the doctrine in a manner similar to ours, as well as the RESTATEMENT (SECOND) OF TORTS. While it would be cleaner and doctrinally preferable to confine our review to Kentucky precedent, our survey will illustrate why that approach is not feasible in this case.

### 1. *History and Development of the Public Duty Doctrine.*

Although often confused with immunity, the public duty doctrine is a distinct concept. Whereas immunity serves as a shield to suit itself, the public duty doctrine focuses on the absence of duty, one of the essential elements of a negligence claim. Because a plaintiff who cannot establish duty has no viable cause of action, the doctrine operates as an affirmative defense.

The public duty doctrine originated as a judicially created rule first articulated by the United States Supreme Court in *South v. State of Maryland for Use of Pottle*, 59 U.S. 396, 15 L. Ed. 433 (1855). In that case, the plaintiff was kidnapped and held for ransom. Upon his release, he sued the county sheriff, alleging that, despite his request for protection, the sheriff neglected and refused to protect him or otherwise keep the peace. In rejecting the claim, the Court held that the sheriff's duty to preserve the public peace was "a public duty, for neglect of which he is amenable to the public, and punishable by indictment only." *Id.* at 403. The public duty doctrine was thus established.

After *South*, most—but not all—states adopted some form of the public duty doctrine as part of their common law jurisprudence. Over time, however, the doctrine has devolved into a complex and fragmented area of American tort law, with little national consistency in how it is applied, or even whether it is recognized at all. Once widely accepted, its application has fractured among the states, creating what courts and scholars alike have described as doctrinal chaos; *see* John Cameron McMillan, Jr., *Government Liability and the Public Duty Doctrine*, 32 VILL. L. REV. 505, 530 (1987).

Some states, including Alaska, Illinois, Missouri, Nebraska, New Mexico, Oregon, Vermont, Wisconsin, and Wyoming, abolished (or refused to adopt) the doctrine, rejecting it as confusing, outdated, or incompatible with modern tort principles.[11] Others, like Arizona, Colorado, Massachusetts, and North Dakota, saw their courts reject the doctrine only for their legislatures to reinstate it in some form via statute.[12] Still other states, such as Louisiana,

---

[11] *Adams v. State*, 555 P.2d 235, 241 (Alaska 1976); *Coleman v. East Joliet Fire Protection Dist.*, 46 N.E.3d 741, 755 (Ill. 2016); *Southers v. City of Farmington*, 263 S.W.3d 603, 613 (Mo. 2008); *Drake v. Drake*, 618 N.W.2d 650, 657 (Neb. 2000); *Schear v. Board of Cnty. Com'rs of Bernalillo Cnty.*, 687 P.2d 728, 731(N.M. 1984); *Brennen v. City of Eugene*, 591 P.2d 719, 725 (Or. 1979); *Hudson v. Town of East Montpelier*, 638 A.2d 561, 568 (Ver. 1993); *Coffey v. City of Milwaukee*, 247 N.W.2d 132, 137-39 (Wis. 1976); *Palm-Egle v. Briggs*, 545 P.3d 828, 835 (Wyo. 2024).

[12] *Ryan v. State*, 656 P.2d 597 (Ariz. 1982), *abrogated by enactment of* Ariz. Rev. Stat. Ann. § 12-820.02; *Leake v. Cain*, 720 P.2d 152 (Colo. 1986), *abrogated by enactment of* Colo. Rev. Stat. Ann. § 24-10-106.5; *Jean W. v. Commonwealth*, 610 N.E.2d 305 (Mass. 1993), *abrogated by enactment of* Mass. Gen. Laws Ann. ch. 258, § 10; *Ficek v. Morken*, 685 N.W.2d 98 (N.D. 2004), *abrogated by enactment of* N.D. Cent. Code Ann. § 32-12.1-03.

Nevada, and West Virginia, have codified variations of the public duty doctrine by statute without the doctrine having been abolished by court decision.[13]

Among states that retain the doctrine, there is little uniformity in its scope or application. Many jurisdictions recognize exceptions to the doctrine where a "special relationship" or "special duty" exists, but the contours of those exceptions vary significantly.[14] Some states, like Michigan, limit the doctrine's reach to the actions of police officers.[15] Others apply it only to discretionary, as opposed to ministerial, functions.[16] Certain other jurisdictions draw distinctions

---

[13] La. Stat. Ann. § 9:2798.1; Nev. Rev. Stat. Ann. § 41.0336; W. Va. Code Ann. § 29-12A-5.

[14] *Finley v. Patterson*, 705 So. 2d 826, 828 (Ala. 1997); *Zelig v. Cnty. of Los Angeles*, 45 P.3d 1171 (Cal. 2002); *Gordon v. Bridgeport Housing Authority*, 544 A.2d 1185, 1190 (Conn. 1988); *GSN Capital, LLC v. Shoshone City & Rural Fire District*, 541 P.3d 703, 710 (Idaho 2024); *Williams v. C-U-Out Bail Bonds, LLC*, 450 P.3d 330, 340 (Kan. 2019); *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 806-07 (Minn. 1979); *Ferreira v. City of Binghamton*, 194 N.E.3d 239, 247-48 (N.Y. 2022); *Multiple Claimants v. North Carolina Dept. of Health and Human Services, Div. of Facility Services, Jails and Detention Services*, 646 S.E.2d 356, 358 (N.C. 2007); *Johnston Equities Associates, LP v. Town of Johnston*, 277 A.3d 716, 740 (R.I. 2022); *Steinke v. S.C. Dep't of Labor, Licensing and Regulation*, 520 S.E.2d 142 (S.C. 1999); *Fodness v. City of Sioux Falls*, 947 N.W.2d 619, 626 (S.D. 2020); *Commonwealth v. Burns*, 639 S.E.2d 276, 278 (Va. 2007); *Norg v. City of Seattle*, 522 P.3d 580, 585 (Wash. 2023).

[15] *Beaudrie v. Henderson*, 631 N.W.2d 308, 317 (Mich. 2001) ("[F]or purposes of determining the liability of public employees other than police officers, we will determine a government employee's duty using the same traditional common-law duty analysis applicable to private individuals."); *Gregory v. Clive*, 651 S.E.2d 709, 711 (Ga. 2007) (holding "the public duty doctrine applies only to police protection services.").

[16] *Trianon Park Condominium Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 920 (Fla. 1985) (explaining the lack of an individual common law duty for exercising a discretionary police power function).

between acts of misfeasance and nonfeasance,[17] while some allow claims to proceed where the government's conduct was grossly negligent or reckless.[18]

These examples illustrate the near impossibility of framing the public duty doctrine in general terms. The variances and exceptions are so numerous that any attempt to do so is destined either to fail outright or to become so overly complicated as to render the doctrine meaningless. Nevertheless, as will become apparent in our review of Kentucky precedent, understanding how the doctrine is applied cross-jurisdictionally is essential to understanding both its use in Kentucky and the gaps in our jurisprudence. With this framework in mind, we now turn to Kentucky-specific case law.

### 2. Kentucky's Case-By-Case Approach to the Public Duty Doctrine.

Because Kentucky has yet to articulate a comprehensive framework for the public duty doctrine, its scope and application cannot be discerned from any one precedent alone. A lone decision, standing apart, is like a single square cut

---

[17] *Stevenson v. City of Doraville*, 751 S.E.2d 845, 848 (Ga. 2013) ("[T]he public duty doctrine's limitation on liability is restricted to cases involving police nonfeasance."); *Estate of Kahn by Rowe v. City of Clermont*, 22 N.W.3d 252, 260 (Iowa 2025) (citations omitted) ("In cases involving nonfeasance, the public-duty doctrine generally applies, and the governmental entity thus may not be held liable unless the plaintiff can otherwise show it had a special relationship with the governmental entity. In cases involving misfeasance, the public-duty doctrine generally does not apply."); *Cope v. Utah Valley State College*, 342 P.3d 243, 253 (Utah 2014) ("In summary, the genesis of the public duty doctrine, the great weight of foreign authority, and our prior caselaw all limit the doctrine's application to omissions.").

[18] *Cooper v. Rodriguez*, 118 A.3d 829, 853 (Md. 2015); *Estate of Graves v. Circleville*, 922 N.E.2d 201, 208 (Ohio 2010).

from a patchwork quilt. Its colors and patterns hint at a larger design, but the full picture remains obscured. Only when the squares are joined together, each contributing its shape and color, does the quilt's complete pattern—and the doctrine's contours—come into view.

The first time the public duty doctrine was expressly referenced by name in Kentucky appellate jurisprudence occurred in 2017. *See McCuiston v. Butler*, 509 S.W.3d 76, 79 (Ky. App. 2017). It would be incorrect, however, to treat *McCuiston* as the proper springboard for our analysis. Although *McCuiston* may represent the first occasion on which the doctrine was expressly labeled as such in Kentucky appellate jurisprudence, a review of our case law makes clear that the principles underlying what is now called the public duty doctrine have been embedded in our jurisprudence for decades.[19]

The beginning of Kentucky's modern public duty jurisprudence occurred at least four decades before *McCuiston*, in *Commonwealth, Department of Banking and Securities v. Brown*, 605 S.W.2d 497 (Ky. 1980). There, the Kentucky Supreme Court was asked to decide whether the Department of Banking and Securities could be held liable in negligence for the malfeasance of its

---

[19] In *McCuiston*, the Court considered claims against a 911 dispatcher whose alleged omissions preceded a decedent's death. The Court referenced the public duty doctrine and purported to apply the "special relationship" exception, but offered no framework for doing so. Instead, it simply concluded—without substantive analysis—that no special relationship existed. 509 S.W.3d at 82-83. Given the fact-intensive nature of public duty cases, this absence of analysis renders *McCuiston* of marginal relevance beyond its historical labeling role.

examiners in regulating two building and loan associations pursuant to statutory mandate. The Court undertook "to define the duty and liability of state government to those persons injured by [the negligent] performance [of a regulatory function]." *Id.* at 498.

The Court first observed that the General Assembly had partially waived the Commonwealth's immunity by permitting negligence claims to be brought before the Board of Claims, but emphasized that the waiver was "limited," placing the Commonwealth in the same posture as municipalities under the common law. *Id.* at 499. Although the Court recognized that the Commonwealth was not immune from suit before the Board of Claims, it nonetheless declined to indulge in "the niceties of academic analysis" to define whether the result reflected the absence of a duty or instead the presence of a duty shielded by immunity. *Id.* at 500. The Court instead explained the "pragmatic effect" of its holding:

> [U]nder the Board of Claims Act, the Commonwealth has no common law liability for the malfeasance of its agents in the performance of obligations running to the public as a whole. It follows that in the matter at bar, the Commonwealth is not liable for the derelictions of its bank examiners in the performance of their regulatory function.

*Id.*

Thus, *Brown* answers the narrow question presented: when the Commonwealth is sued in its official capacity, it cannot be held liable before the

-24-

Board of Claims for the malfeasance of its agents in carrying out statutory duties owed to the public at large. The Court did not address whether individual officers might be liable in their personal capacities, whether exceptions might exist, or whether its reasoning extended to nonfeasance. More importantly, as the Court later observed in *Collins v. Commonwealth of Kentucky Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122, 126 (Ky. 1999), *Brown* "was rendered prior to the enactment of the 1986 amendment [to the Board of Claims Act] that clearly waived sovereign immunity for the negligent performance of ministerial acts." This makes *Brown* only marginally relevant to cases involving the negligent performance of ministerial acts. Still, it is useful to understand when and how the concept of public duty worked its way into our common law; specifically, that it did so prior to the Commonwealth's decision to partially waive its immunity for negligence in the performance of ministerial acts.

The next significant case in this line is *Fryman*, 896 S.W.2d 908, *holding modified by Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014). There, Harrison was assaulted by Robert Custard after Custard had been released from jail without a proper bond being posted. Harrison sued the jailer and circuit clerk, alleging their negligence in releasing Custard caused his injuries. The central question before the Court was whether those officials, sued in their individual capacities, owed Harrison a legal duty to protect him from

Custard's criminal acts. In holding that the jailer and circuit clerk owed no duty to protect Harrison from Custard, the Court expressly adopted the "special relationship" requirement articulated in *Ashby v. City of Louisville*, 841 S.W.2d 184 (Ky. App. 1992).[20]

The Court explained that public officials owe no affirmative duty to protect individual citizens from the criminal acts of third parties absent a special relationship. Because Harrison was not in custody and Custard was not a state actor, the Court concluded no special relationship existed. The Court further emphasized that "[t]he assault by Custard was an intervening or superseding cause which was not under the control of either [the jailer or the clerk]." *Fryman*, 896 S.W.2d at 911. The Court also went on to note that neither the jailer nor the clerk owed a statutory duty to the victim, and there were no facts alleged that either the clerk or the jailer knew that the assailant was likely to cause bodily harm to the victim if not controlled.

The next significant case is *City of Florence v. Chipman*, 38 S.W.3d 387 (Ky. 2001). There, the administrator of Conni Black's estate brought a wrongful death negligence claim against three Florence police officers and the City

---

[20] In *Ashby v. City of Louisville*, 841 S.W.2d 184 (Ky. App. 1992), the estate of a murder victim brought suit against the city and its police officers, alleging negligence in failing to protect her from a known assailant. We held that, absent a custodial relationship or other special circumstances, public officials owed no duty to protect individual citizens from private violence. *Id.* at 186-87.

after Black was killed in a vehicle crash shortly after leaving the scene of a traffic stop with her intoxicated boyfriend. The trial court granted summary judgment for the defendants, but the Court of Appeals reversed, finding a special relationship existed and that the officers' discretion became ministerial once Black was "in custody."

The Supreme Court reversed. Applying *Fryman* and *Ashby*, the Court reaffirmed that a special relationship exists only when (1) the victim is in state custody or otherwise restrained by the state at the time of the injury-producing act, and (2) the harm is caused by a state actor. The Court rejected the Court of Appeals' reliance on foreseeability as a substitute for the custody requirement, holding that foreseeability cannot create a duty absent a special relationship. Because Black voluntarily left with her boyfriend, was never in police custody or otherwise restrained, and the harm was caused by a private actor, no special relationship existed and thus no duty was owed.

The Court further held that even if custody had been established, the fatal crash resulted from a superseding, intervening cause—the altercation between Black and her boyfriend while driving—which was wholly outside the control of the police officers.

The next case we must consider is *Pile v. City of Brandenburg*, 215 S.W.3d 36 (Ky. 2006), a wrongful death action arising after a police officer left his

-27-

cruiser running and unattended with a handcuffed arrestee inside. The arrestee managed to steal the vehicle and drove it into oncoming traffic, colliding head-on with another vehicle and killing its driver.

The Court first addressed the nature of the officer's duty. Controlling and securing a police cruiser, particularly when leaving it unattended with a detainee inside, was deemed a ministerial act—a routine, regulated responsibility governed by both departmental procedures and statute. In particular, KRS 189.430 requires that before leaving a vehicle unattended, an officer must stop the engine, lock the ignition, and remove the key. The Court concluded that this statutory duty existed for the protection of the public and that the decedent was within the class of persons the statute intended to protect. Consequently, the officer was not entitled to qualified immunity.

Turning to the special relationship doctrine, the Court recited the *Ashby–Fryman* formulation requiring (1) that the victim be in state custody or otherwise restrained, and (2) that the harm be inflicted by a state actor. However, without reconciling the apparent inconsistency, the Court found "no question" that the first prong was met because the perpetrator—the arrestee who stole the cruiser—was in custody. This reasoning creates uncertainty over whether *Pile*

silently expanded the doctrine so that custody over the perpetrator can also satisfy the first prong.[21]

The Kentucky Supreme Court revisited *Fryman*'s special-relationship framework in *Gaither*, 447 S.W.3d 628, a wrongful death action brought by the estate of a confidential informant killed during an undercover "buy/bust" narcotics operation. Gaither's identity had been compromised before the operation, yet Kentucky State Police (KSP) officers nonetheless directed him to participate. During the controlled buy, the suspects discovered Gaither was cooperating with police and murdered him. The Board of Claims awarded damages for the negligent performance of ministerial duties, but the Franklin Circuit Court and Court of Appeals reversed, concluding that the actions complained of were discretionary.

The Supreme Court reinstated the award, clarifying two important aspects of public-duty and immunity jurisprudence. First, the Court held that although many operational decisions by law enforcement are discretionary, a duty may be ministerial if it is dictated by "a known rule of law enforcement" derived from statute, regulation, common law, or universally accepted professional

---

[21] Justice Graves, joined by Justice Wintersheimer, dissented, emphasizing that the victim was not in custody and that the majority's reasoning improperly blurred the *Ashby-Fryman* requirement. The dissent noted that the majority never addressed this defect, a silence that lends weight to the view that *Pile* either represents a departure from, or at least a softening of, the *Ashby-Fryman* custody requirement in special-relationship cases.

practice. *Id.* at 639-40. The Court found that using an informant whose identity was compromised violated such a known rule, and that this duty was absolute and imperative, not subject to the officer's discretion.

Second—and more pertinent to our discussion—the Court confronted the absence of a traditional *Ashby-Fryman* special relationship. Under *Ashby-Fryman*, such a relationship exists only where (1) the victim is in state custody or otherwise restrained at the time of injury, and (2) the harm is inflicted by a state actor. Gaither was not in custody, and his killers were private actors. Nevertheless, the Court concluded that KSP owed Gaither a duty because the agency had an ongoing operational relationship with him, exercised substantial control over his actions during the operation, and placed him in a position of foreseeable and extreme danger.

In doing so, *Gaither* made clear that the *Ashby-Fryman* custody/state-actor test, while still the rule in its traditional context, is not the sole pathway to a duty. Where the facts establish a comparable degree of control, reliance, and foreseeability, the absence of formal custody will not defeat a negligence claim. As the Court explained, the essence of the special relationship exception is the element of control by the government.[22]

---

[22] Justice Scott, concurring in part and dissenting in part, cautioned that expanding liability beyond *Fryman*'s formal custody requirement risked unduly broadening governmental exposure. While he agreed that Gaither's case involved compelling facts and foreseeable harm, he warned

In *Collins v. Commonwealth, Transportation Cabinet, Department of Highways*, 516 S.W.3d 320, 320 (Ky. 2017), the administratrix of a school bus driver's estate brought a negligence claim against the Department of Highways, alleging it failed to enforce statutory width and length restrictions on a stretch of U.S. Highway 119, allowing an oversized tractor-trailer to collide with the bus and cause the driver's death. The Board of Claims dismissed the action, concluding the Department's duty to enforce was ministerial but reasonably performed; the circuit court reversed, finding a negligent breach.

The Kentucky Supreme Court affirmed the dismissal but on different grounds, holding the Department owed no duty—statutory, regulatory, or common law—to enforce the width and length restrictions. KRS 189.221, which imposes such restrictions, does not designate the Department as the enforcing authority, and no evidence suggested the Department had control over Vehicle Enforcement Officers, the statutorily charged enforcement agents. The Court also declined to extend the Department's common-law duty to maintain highways in a reasonably safe condition to include general traffic law enforcement.

The Court addressed the Court of Appeals' reliance on the *Ashby-Fryman* special relationship test, emphasizing that the doctrine applies in cases

---

against creating a "generalized duty" in situations lacking the clear custodial relationships recognized in prior precedent. *Id.* at 645-46 (Scott, J., concurring in part, dissenting in part).

involving the general duty of public officials—usually law enforcement—to protect the public from criminal acts. That framework was "inapposite" because the claim in *Collins* was not based on the negligence of a particular officer, nor on the universal duty of law enforcement to prevent crime. Instead, the case turned on whether the Department itself had any duty to enforce the size restrictions, which it did not.

Lastly, we consider the Kentucky Supreme Court's decision in *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 846 (Ky. 2005), a case that, at first glance, may appear unrelated to the present facts. Nonetheless, its discussion of the special relationship doctrine, particularly the circumstances under which such a relationship may arise, provides important guidance for our analysis. The case arose from a wrongful death action against the national governing body of the Fraternal Order of Eagles ("Grand Aerie") following the alcohol-related death of nineteen-year-old Ashley Carneyhan. Ashley was killed in a single-vehicle crash after consuming alcohol at a local chapter in a dry county. The plaintiffs alleged that Grand Aerie negligently supervised and failed to control its local chapter's activities.

The Court held that Grand Aerie owed no duty to the decedent under Kentucky law. Applying the RESTATEMENT (SECOND) OF TORTS §§ 315-320, the Court explained that absent a "special relationship" between the defendant and

-32-

either the injured party or the tortfeasor, there is generally no duty to control the conduct of a third person. The Court found no such relationship between Grand Aerie and the local chapter sufficient to impose liability for the decedent's death. Although the case had nothing to do with a parolee or probationer, the Court's special relationship analysis prompted a lengthy discussion of recognized relationships in which a duty to control is imposed, including "one who takes charge of a person with dangerous propensities." Citing the Restatement and case law from other jurisdictions, the Court identified custodial and supervisory contexts such as the relationship between a parole or probation officer and an offender as examples where the law may impose such a duty.[23]

This is significant because, while Kentucky has not applied the public duty doctrine in the context of probation or parole supervision in a published case, the Court in *Grand Aerie* expressly acknowledged—albeit in dicta—that such relationships may give rise to a duty to control under the Restatement's special-relationship principles.

---

[23] For example, in *Taggart v. State*, 822 P.2d 243, 255 (Wash. 1992), the Washington Supreme Court held that parole officers have a duty to protect others from reasonably foreseeable dangers posed by parolees' dangerous propensities, subject to limits designed to preserve legitimate immunity protections. That duty arises only after the plaintiff pierces both absolute and qualified immunity by showing the officer's conduct was outside any judicial or quasi-judicial process and violated a statutory duty prescribed by law or superiors. The court later extended this principle to probation officers in *Hertog ex rel. S.A.H. v. City of Seattle*, 979 P.2d 400, 403 (Wash. 1999), holding that municipal probation counselors have a duty to control probationers to protect others from reasonably foreseeable harm.

### 3. *Tying Together Kentucky's Fragmented Public Duty Doctrine Case Law.*

As previously discussed, Kentucky generally applies the public duty doctrine, which holds that a duty owed to the public at large is not enforceable in tort by an individual absent an applicable exception. The most clearly recognized exception is the special relationship doctrine. In *Ashby* and *Fryman*, our appellate courts noted that a special relationship exists where the victim is in state custody. *Gaither* refined that rule, explaining that "the narrow confines of the *Fryman–Ashby* test do not capture the only occasions on which a negligent government official should reasonably foresee that his negligence is likely to put a specific individual in harm's way at the hands of a specifically known and identifiable third party." *Gaither*, 447 S.W.3d at 638. There, the victim was not in formal custody, yet the Court recognized a duty based on the Commonwealth's substantial control over the circumstances leading to the harm, combined with the plaintiff's reliance on governmental undertakings. *Gaither* thus confirms that formal custody is not an absolute prerequisite; a duty can arise where governmental control and reliance create a relationship particularized to the plaintiff. In *Pile*, the Court concluded that a special relationship existed where the perpetrator—not the victim—was in custody.

*Grand Aerie*, citing RESTATEMENT (SECOND) OF TORTS § 315, further recognized that a special relationship exists when "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection."[24] Parole and probation supervision was specifically cited as an example of a relationship that could, under appropriate circumstances, give rise to a special relationship.

Taken collectively, these cases demonstrate that the special relationship exception is not confined to a single factual scenario. While custody of the victim remains the most straightforward basis for finding a duty, Kentucky precedent also supports the conclusion that custody of the perpetrator, substantial governmental control, or the plaintiff's reasonable reliance on a governmental undertaking may suffice. Thus, while Kentucky's appellate decisions have not yet crystallized into a comprehensive public duty doctrinal framework, the case law reflects acceptance of the doctrine, recognition of the special relationship

---

[24] The RESTATEMENT (THIRD) OF TORTS carries forward the same principle. Comment f to Section 41 specifically addresses the parole/probation context: "those who supervise parolees, probationers, or others in prerelease programs engage in more ministerial functions, and they are held to an affirmative duty of reasonable care. The extent of control exercised by the custodian—parole and probation officers have limited control over those whom they supervise—is a factor in determining whether the custodian has breached the duty of reasonable care." RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 41 cmt. f (2012). This reinforces that such supervisory relationships can give rise to a duty beyond that owed to the public at large, with the scope of that duty shaped by the nature and degree of control exercised.

exception, and openness to other exceptions—particularly those grounded in statutory duties, affirmative undertakings, reliance, and custodial control. The precise contours of those exceptions, and their interaction with qualified immunity and the discretionary/ministerial distinction, remain unsettled and largely dependent on the specific facts at hand.

Appellants contend that the public duty doctrine should apply only when public officials act pursuant to discretionary duties, not ministerial ones. Several jurisdictions have adopted that view. *Wallace v. Dean*, 3 So. 3d 1035, 1049 (Fla. 2009); *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 806-07 (Minn. 1979); *Fodness v. City of Sioux Falls*, 947 N.W.2d 619, 626 (S.D. 2020). This is not, however, a universally applied rule.[25] While Kentucky's appellate courts have not expressly resolved the issue, they have hinted that the doctrine may not extend to ministerial duties, especially statutory ones.[26] However, given the lack of a clear directive and out of an abundance of caution, we assume without

---

[25] *Southers v. City of Farmington*, 263 S.W.3d 603, 617 (Mo. 2008).

[26] While federal authority is not binding on this Court, it is noteworthy that at least one federal court applying Kentucky law has considered whether the public duty doctrine applies to ministerial acts. In *Warner v. Midnight Recovery, Inc.*, No. 3:19-CV-00453-RGJ, 2020 WL 1105111, at *6 (W.D. Ky. Mar. 6, 2020), the court observed that "[a]lthough Kentucky courts have not considered whether the failure to perform ministerial duties can also abrogate public officials' protections from liability under the public duty doctrine, it seems possible that a court would find so."

deciding that the doctrine applies—at least to some extent—to both ministerial and discretionary actions.

## D. *Negligence Claim Against Officer Mull.*

Having addressed the contours of Kentucky's public duty doctrine and its exceptions, we now turn to the specific negligence claim asserted against Officer Mull. The elements of negligence are well settled. "It is elementary for all tort cases that the plaintiff must establish a duty, breach thereof, causation, and injury." *Saint Elizabeth Medical Center, Inc. v. Arnsperger*, 686 S.W.3d 132, 138 (Ky. 2024). Duty is a question of law for the court; breach and injury are ordinarily for the jury, and causation presents a mixed question of law and fact. *Id.* We address these elements in turn, beginning with duty—which in this case implicates the public duty doctrine—before turning to causation and concluding with breach and injury.

### 1. Duty.

The record here establishes that Stewart was designated as a high-supervision offender and placed under Officer Mull's supervision. While under supervision, Stewart was arrested and convicted in Tennessee for arson and aggravated assault—serious crimes of which Officer Mull was aware. Under KDOC policies, procedures, and relevant Kentucky statutes, Officer Mull had a mandatory obligation to report these violations. Despite having knowledge of

-37-

Stewart's out-of-state arrest, conviction, and resulting violations—including leaving the state without authorization—Officer Mull did not report the violations as required.

The supervisory relationship here—though not involving physical confinement—was sufficient to establish legal control. The law does not require constant physical custody; it requires the power and duty to take reasonable steps to prevent foreseeable harm. Officer Mull's statutory obligation to monitor and report probation violations placed him in precisely such a position of control, triggering the special relationship exception to the public duty doctrine.

We conclude that the supervisory relationship between Officer Mull and Stewart falls within the type of "special relationship" contemplated by the Restatement and recognized in *Grand Aerie*. As Stewart's parole officer, Officer Mull had constructive control over his parole status and the authority, through reporting violations, to initiate proceedings that could have resulted in Stewart's return to custody and thereby removing him from the community.

This level of control, while not equivalent to direct physical custody, is analogous to the custodial or quasi-custodial relationships identified in *Pile* and consistent with the Restatement's examples of relationships giving rise to a duty to control. Much like the victims in *Pile*, Appellees were members of the very community the relevant statutes and regulations were designed to protect. *Pile*,

215 S.W.3d at 39 ("The negligent operation of an emergency vehicle by a police officer which violates existing police procedures or regulations or statutory traffic regulations is certainly actionable and outside the scope of the common law doctrine of 'special relationship' relied on by the City and Officer Miller."). Where, as here, a parole officer is charged with supervising an individual convicted of violent offenses, it is at least arguably foreseeable that failing to report serious parole violations could allow the parolee to remain at large and commit further violent acts against members of the protected community. That foreseeability, combined with the supervisory authority granted by statute and regulation, is sufficient to bring this case within the recognized special relationship exception to the public duty doctrine.

Of course, concluding that Officer Mull owed a duty of care does not mean liability follows as a matter of law. Even where an affirmative duty exists, there may still be substantial questions as to whether the defendant's conduct actually caused the harm alleged. Those questions, together with proximate cause, must still be addressed to determine whether the breach of duty was a substantial factor in bringing about the injury.

### 2. Causation.

Causation in negligence consists of two elements: cause-in-fact and proximate cause. *Patton v. Bickford*, 529 S.W.3d 717, 730-31 (Ky. 2016). Cause-

in-fact requires "a direct, distinct, and identifiable nexus between the defendant's breach of duty and the plaintiff's damages such that the event would not have occurred 'but for' the defendant's negligent or wrongful conduct." *Id.* at 730; *see also Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 577 (Ky. 2019) (conduct must be a "substantial factor" in causing the injury). Proximate cause, by contrast, "captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff's damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability." *Patton*, 529 S.W.3d at 731; *accord Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (Ky. 2019).

      **a. Cause-in-fact.** Viewing the record in the light most favorable to Appellants, a reasonable jury could find that Officer Mull's failure to report Stewart's serious probation violations was a substantial factor in allowing Stewart to remain at liberty and in a position to commit the shooting. As *Gonzalez* recognizes in a different policing context, "an officer can be the cause-in-fact and legal cause of damages inflicted upon a third party" when negligent law-enforcement conduct sets the harmful chain of events in motion. 581 S.W.3d at 535. Here, Officer Mull's non-reporting allegedly prevented initiation of proceedings that could have resulted in detention, heightened supervision, or other restraints. That the sentencing court *might* have declined to revoke even if notified

does not defeat cause-in-fact; the question is whether Officer Mull's omission was a necessary condition of the harm, not whether judicial action was guaranteed. *See Patton*, 529 S.W.3d at 730 ("but-for" focuses on whether the event would have occurred without the omission); *cf. Zavalas v. State*, 809 P.2d 1329, 1334 (Or. 1991) (failure to report parole violations could be found a substantial contributing cause despite uncertainty of judicial response).

**b. Proximate cause.** Proximate cause limits liability on grounds of foreseeability and policy. *Patton*, 529 S.W.3d at 731 (quoting *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 671 (8th Cir. 2009)). Kentucky measures proximate cause by whether the injury was the "natural and probable" consequence of the negligent act and focuses responsibility on those "collective cause or causes for which [the law] lays responsibility." *House v. Kellerman*, 519 S.W.2d 380, 382 (Ky. 1974). In assessing foreseeability, Kentucky expressly adopts the RESTATEMENT (SECOND) approach: when the hazard that materializes is among the very risks that made the conduct negligent, intervening criminality does not cut off liability. *Britton v. Wooten*, 817 S.W.2d 443, 449-52 (Ky. 1991) (adopting §§ 448, 449, 302B).

Applied here, the purpose of the mandatory reporting and documentation regime is to identify and mitigate the danger posed by noncompliant offenders—particularly those with violent histories—by triggering

sanctions, enhanced supervision, or custody. A factfinder could therefore conclude that the risk which materialized (Stewart's violent offenses) was precisely the hazard that rendered Officer Mull's non-reporting negligent in the first place. *See Britton*, 817 S.W.2d at 449 (third-party intentional/criminal acts do not supersede where such conduct is among the hazards that make the defendant negligent). Kentucky's "substantial factor" formulation further supports sending proximate cause to the jury when the evidence allows competing inferences about how the defendant's conduct interacted with subsequent events. *Lewis*, 581 S.W.3d at 577; *Gonzalez*, 581 S.W.3d at 532. And *Patton* underscores that proximate cause is ultimately a legal limitation, but one typically resolved on the facts unless only one conclusion is reasonably possible. 529 S.W.3d at 731 (citing *House*, 519 S.W.2d at 382).

The type of harm that befell Appellees was not so extraordinary or unforeseeable as to sever the chain of proximate cause as a matter of law. The very purpose of requiring probation officers to report violations—particularly violent or weapons-related violations—is to mitigate the risk of future criminal conduct by supervisees. *See Britton*, 817 S.W.2d at 451 (no superseding cause where the harm was among the hazards making the conduct negligent). Thus, violent reoffending was within the class of foreseeable risks that made the duty to report necessary. On this record, reasonable minds could differ regarding whether

Officer Mull's non-reporting left the public exposed to a foreseeable danger the reporting rules were designed to prevent.

**c. Superseding cause.** The superseding-cause doctrine "interplays with proximate causation" and relieves a negligent actor of liability only when a third party's conduct is "extraordinary" and "unforeseeable." *NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. App. 1993). *NKC* identifies factors illustrating a true superseding cause: an intervening act of independent origin that was itself capable of producing the harm and was not reasonably foreseeable, coupled with the original act being merely a remote condition rather than a substantial factor. *Id.* When, however, "the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent," the intervening act—even if "innocent, negligent, intentionally tortious, or criminal"—does not supersede. *Britton*, 817 S.W.2d at 449 (quoting § 449).

Under these principles, Stewart's crimes do not categorically break the chain. The allegations are that Officer Mull failed to report serious violations by a high-risk offender—conduct that foreseeably increases the chance of further violent crime. A jury could therefore find the later shooting neither "extraordinary" nor "unforeseeable" in the *NKC* sense but rather within the very risk that made the omission negligent. *See Britton*, 817 S.W.2d at 449-52. That conclusion is consistent with Kentucky's treatment of law-enforcement negligence

where officers' acts or omissions can be both the factual and legal cause of third-party harms when foreseeability aligns with the risk their conduct created. *Gonzalez*, 581 S.W.3d at 535.

**d. Summary-judgment posture.** Finally, causation "presents a mixed question of law and fact." *Patton*, 529 S.W.3d at 729. Kentucky courts reserve proximate-cause or superseding-cause determinations for the court only when the essential facts are undisputed and "but one conclusion may reasonably be drawn from the evidence." *House*, 519 S.W.2d at 382; *see also Lewis*, 581 S.W.3d at 577. Given evidence that (i) mandatory reporting existed to precisely address the danger at issue, (ii) Officer Mull knew of Stewart's charges and conviction but failed to report, and (iii) Stewart remained at large and committed violent offenses, reasonable jurors could differ on whether Officer Mull's omission was a substantial factor and whether Stewart's crimes were within the foreseeable scope of the risk. Summary judgment on causation was therefore inappropriate.

## IV. CONCLUSION

Summary judgment was properly granted to Director Hargis, Supervisor Patterson, and Assistant Supervisor Ryan. Their challenged conduct was discretionary, and they are entitled to qualified official immunity.

Officer Mull's failure to report Stewart's repeated probation violations was a ministerial act subject to an affirmative obligation. By virtue of his

supervisory authority over Stewart, Officer Mull exercised sufficient control to create a special relationship removing this case from the protection of the public duty doctrine.

As a matter of law, proximate cause cannot be decided in Mull's favor. The risk of harm that materialized was within the scope of hazards that made his omission negligent. The remaining question of but-for causation presents a genuine issue of material fact for the jury.

Accordingly, the Jefferson Circuit Court's judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Tad Thomas
Lindsy Lopez
Julie P. Anderson
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLANTS J. CHRIS LANE
AND ESTATE OF FREDERICK
O'BANNON:

Tad Thomas
Prospect, Kentucky

BRIEF FOR APPELLEES
DEPARTMENT OF
CORRECTIONS, AMBER RYAN,
BRIAN PATTERSON, ERICA
HARGIS, AND COOKIE CREWS:

Peter Ervin
Allison R. Brown
Robert Chaney
Frankfort, Kentucky

ORAL ARGUMENT FOR
APPELLEES AMBER RYAN,
BRIAN PATTERSON, ERICA
HARGIS, AND COOKIE CREWS:

Peter F. Ervin
Frankfort, Kentucky

ORAL ARGUMENT FOR
APPELLEE CHRISTOPHER MULL:

Kevin M. Glogower
Louisville, Kentucky